Filed 5/24/22 (unmodified opinion attached)

<u>CERTIFIED</u> <u>FOR</u> <u>PARTIAL</u> <u>PUBLICATION</u>*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C088883 |
| Plaintiff and Respondent, | (Super. Ct. No. 17FE008447) |
| v. | ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING |
| KEJHONNE M. HENDERSON, | |
| Defendant and Appellant. | [NO CHANGE IN JUDGMENT] |

APPEAL from a judgment of the Superior Court of Sacramento County, Stacey Eurie Boulware, Judge. Affirmed as modified.

Byron C. Lichstein, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris and Xavier Becerra, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans, Supervising Deputy Attorney General, Timothy L. O'Hair, Deputy Attorney General, for Plaintiff and Respondent.

---

* Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of Parts III – VIII and the dissenting opinion.

1

THE COURT:

It is ordered that the partially published opinion filed on May 11, 2022, be modified as follows:

1.    On page 63, under the heading Disposition, delete and replace with the following:

We affirm the conviction but remand to allow the trial court to consider exercising its discretion under section 12022.53, subdivision (h) and section 1385 to strike the section 12022.53, subdivision (d) enhancement in the interest of justice and impose instead a lesser enhancement under subdivisions (b) or (c) of section 12022.53.

This modification does not change the judgment.  Appellant's petition for rehearing is denied.

FOR THE COURT:


        /s/
HULL, Acting P. J.


        /s/
HOCH, J.


        /s/
MURRAY, J.*

_____

*  Retired Associate Justice of the Court of Appeal, Third Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Filed 5/11/22; Opinion following transfer from Supreme Court (unmodified opinion)

<u>CERTIFIED</u> <u>FOR</u> <u>PARTIAL</u> <u>PUBLICATION</u>*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C088883 |
| Plaintiff and Respondent, | (Super. Ct. No. 17FE008447) |
| v. | |
| KEJHONNE M. HENDERSON, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Sacramento County, Stacey Eurie Boulware, Judge.  Affirmed as modified.

Byron C. Lichstein, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris and Xavier Becerra, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans, Supervising Deputy Attorney General, Timothy L. O'Hair, Deputy Attorney General, for Plaintiff and Respondent.

---

*  Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of Parts III – VIII and the dissenting opinion.

1

Defendant Kejhonne M. Henderson shot and killed J.P. at a house party in the North Highlands neighborhood of Sacramento. Upset that music of a local rapper disparaging his neighborhood's gang was being played, defendant exchanged heated words with the party's host. When J.P. intervened, he and defendant agreed to step outside. On their way to the door, defendant pulled a handgun out of his waistband and, when they got outside, shot J.P. multiple times in the head and chest. A.J., one of the party goers tackled defendant and knocked the gun out of his hand. Defendant regained possession and shot A.J. multiple times before fleeing. J.P. died before emergency services arrived at the scene, but A.J. survived.

A jury found defendant guilty of one count of second degree murder (Pen. Code, § 187)[1] and one count of attempted murder (§§ 664/187) and found true enhancement allegations that defendant personally discharged a firearm causing great bodily injury or death (§ 12022.53, subd. (d)) as to each count. The trial court sentenced defendant to serve an aggregate determinate term of seven years plus an aggregate indeterminate prison term of 65 years to life.

On appeal, defendant contends: (1) the trial court prejudicially abused its discretion and violated his federal constitutional right to a jury drawn from a representative cross-section of the community by excusing two African-American prospective jurors for cause based on their stated belief that the criminal justice system treats African-Americans unfairly and because they were sympathetic towards defendant; (2) the trial court abused its discretion in dismissing a sitting juror during trial for dishonesty; (3) the prosecutor violated defendant's federal constitutional rights by intentionally obtaining privileged and confidential information from the Director of the Conflict Criminal Defenders about defense counsel's attempts to obtain expert witness

---

[1] Undesignated statutory references are to the Penal Code.

2

funding; (4) the trial court prejudicially abused its discretion and further violated defendant's constitutional rights by allowing the prosecutor to present assertedly misleading testimony and argument regarding the defense's ability to perform an independent forensic analysis; (5) the trial court prejudicially erred by improperly instructing the jury regarding circumstantial evidence; (6) the cumulative prejudicial impact of the foregoing asserted errors requires reversal; (7) the trial court abused its discretion by not considering reducing the 25 years to life firearm enhancements to lesser included firearm enhancements; (8) the trial court erred by imposing a restitution fine without an ability to pay hearing in violation of *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*); and (9) trial counsel provided constitutionally ineffective assistance of counsel by not submitting a *Franklin*[2] package for future youthful offender parole consideration.

In the published portion of this opinion, we conclude that a trial court may not excuse for cause African-American prospective jurors solely because of their belief that the criminal justice system treats African-Americans unfairly, but reject defendant's assertion that the two African-American prospective jurors here were excused for that reason. They were excused because the trial court concluded that, based on the voir dire evidence, they could not be impartial because of their bias and sympathy for defendant. On this record, we cannot conclude the court's ruling was an abuse of discretion; nor was defendant's constitutional right to a jury drawn from a representative cross-section of the community violated.

We further conclude the trial court erred in excusing a seated juror under section 1089, because the record does not demonstrate to a demonstrable reality that the juror

---

[2] *People v. Franklin* (2016) 63 Cal.4th 261 (*Franklin*).

3

could not perform his duties.  However, applying the harmless error standard in *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*), we conclude the error was harmless.

In the unpublished portion of this opinion, we reject defendant's other claims of error, except as to his challenge to the firearm enhancement.[3]

We affirm the conviction but remand to allow the trial court to consider exercising its discretion under section 12022.53, subdivision (h) and section 1385 to strike the section 12022.53, subdivision (d) enhancement in the interest of justice and impose instead a lesser enhancement under subdivisions (b) or (c) of section 12022.53.

## FACTUAL AND PROCEDURAL BACKGROUND

### The Shooting

On May 5, 2017, defendant's girlfriend S.S. drove him to the house party.[4]  The host of the party was one of S.S.'s former friends, M.L.  When S.S. pulled up, she saw "a

---

[3] We previously filed an opinion addressing and rejecting defendant's contention as to the firearm enhancement. We held in the unpublished portion of our opinion that the trial court did not abuse its discretion by not considering whether to reduce the firearm enhancement to a lesser included firearm enhancement.  The California Supreme Court granted review on this issue and deferred the appeal pending its decision in *People v. Tirado* S257658.  (*People v. Henderson* (2021) 68 Cal.App.5th 709, review granted November 23, 2021, S271346.)  Our high court ultimately transferred the matter back to us with directions to vacate our decision and reconsider the cause in light of its decision in *People v. Tirado* (2022) 12 Cal.5th 688, which clarified that trial courts do have discretion to reduce firearm enhancements to a lesser included firearm enhancement under Penal Code section 12022.53, subdivision (b) or (c).

[4] At trial, defendant's defense was misidentification, but he does not challenge the sufficiency of the evidence as to his identity as the shooter on appeal.

Regarding how defendant got to the party, it is undisputed he was with S.S. earlier in the evening.  He was with her at her house and then went out to dinner with her, her mother and younger brother, V.S.  They arrived at the restaurant about 9:00 p.m. and returned to S.S.'s house about 11:30 p.m.  Although S.S. denied bringing defendant to the party, as we describe *post*, multiple witnesses told the police they saw them together at the party.  They also left the party at the same time, after defendant shot the two victims.

crowd of people like outside" the party location, including M.L.'s mother. S.S. walked up with defendant and gave M.L.'s mother a hug before continuing into the house.

Inside the house, M.L. was playing music. When S.S. walked in with defendant, a song by Mozzy was playing. As the prosecution's gang expert testified, Mozzy is a rapper and validated member of the Fourth Avenue Bloods from Oak Park. His lyrics disparage rival Del Paso Heights Bloods gang members, and people from "the Heights" do not like his music.

S.S. spoke to M.L. in the living room while defendant exchanged words with another young man who was also in the living room. As M.L. explained in her police interview, while she could not hear what was being said between defendant and the other young man, there "was clearly a problem."[5]

Defendant then turned his attention to M.L., saying "turn that sucka shit off" and "strictly twos Del Paso Heights." M.L. understood this to mean he wanted her to change the Mozzy song that was playing. As she did so, defendant "just kept talking, talking about stupid twos, strictly the Heights, da-da-da-da-da, one Del Paso, this and that sucka shit."[6]

While defendant was confronting M.L. over the music, her close friend, J.P., entered the living room from the kitchen and asked her if she was okay. J.P. then confronted defendant, who responded: " 'What are you tryin' to do? Let's step outside.' " J.P. agreed. As they turned to step outside, defendant pulled a handgun out of

_____

And according to a statement S.S.'s brother gave to the police, they arrived back at S.S.'s house together later that night. We also note S.S. testified that defendant did not drive. A reasonable inference from all of the evidence is that S.S. drove defendant to the party.

[5] Much of the evidence in the trial consisted of prior statements to the police of witnesses who had denied making those statements or had failures of recollection when they testified.

[6] As discussed, *ante*, these statements were things Del Paso Heights Bloods say.

his waistband and held it by his side. One of J.P.'s friends, J.M., saw defendant pull out the gun and walked out of the house ahead of defendant and J.P. Defendant opened fire on J.P. as soon as they got outside, shooting J.P. multiple times including the back of the head.[7] As J.M. described in his statement to police: "He didn't even give him a chance." J.M. ran away after the first couple rounds were fired, but not before seeing defendant shoot his friend in the head and lower back. A different witness to the shooting explained in her statement to police that three rounds were fired while J.P. was standing. Five or six additional rounds were fired after J.P. fell to the ground.

When defendant stopped firing, another of J.P.'s friends, A.J, chased defendant and tackled him to the ground, knocking the gun out of his hand. Defendant managed to pick up the gun and then shot A.J. three times before running away. M.L.'s mother, who was still outside when the shooting occurred, was also hit in the calf by one of the rounds fired by defendant.[8] She and A.J. survived their injuries. J.P. died before emergency services arrived at the scene.

**Gang Evidence**

As noted, while complaining about the music prior to the shooting, defendant refenced "stupid twos" and "strictly twos Del Paso Heights" while demanding that the party hosts "turn that sucka shit off." A gang expert testified that members of the Del Paso Heights Bloods often use a gang sign meant to display the letter H, which "stands for The Heights." This gang sign involves extending the pointer and pinky finger up.

---

[7] A forensic pathologist testified J.P. was struck by at least seven rounds. One round entered the back of J.P.'s head on the left side. Two rounds entered in the back and one entered the right buttock. Rounds also entered J.P.'s right nostril, his chin area, and his chest. J.P. also sustained gunshot wounds to both arms, but it was not clear whether these wounds were caused by separate additional rounds, or by two of the rounds that caused the other wounds.

[8] No charges were filed naming M.L.'s mother as a victim.

Referring to this gang sign, Del Paso Heights Bloods often verbally claim membership in the gang by saying some variation of: "Twos Up, stupid twos, It's all about the twos."

The term "Su[c]ka" is a derogatory term for rival gang members. The expert further opined that if a Mozzy song was playing at a party in Sacramento and a person said, " 'Shut that suc[k]a off,' " that would indicate that person was affiliated with a rival gang.

## Identification Evidence

Although witnesses who previously identified defendant did not do so at trial, proof of defendant's identity as the shooter was nevertheless strong. Both J.M. and M.L. identified him out of a photo lineup. J.M. also described defendant as being a "dark skinned" African-American male, 5 feet 9 inches to 5 feet 10 inches in height, and about 170 to 180 pounds. He further explained that defendant was wearing a blue hooded jacket when he walked into the party with a girl that generally matched S.S.'s description. The host described defendant as being, "probably like six-three, six-four," and bigger in build, "maybe like 230," but confirmed he was wearing a "navy blue" hooded sweatshirt with a "yellow Polo symbol" and also identified S.S. as the person he was with when they arrived at the party. Another witness, who did not identify defendant, described the shooter as being a "dark skinned" African-American male, 5 feet 11 inches to 6 feet in height, and wearing a "dark blue" hooded sweatshirt.

From M.L.'s position inside the house, she was able to see S.S.'s response to the shooting. As M.L. explained, when the shooting started outside, "everyone was trying to get in" except for S.S. She pushed through the crowd of people coming inside and left the house. M.L. assumed she was leaving with defendant. This assumption turned out to be correct. As S.S.'s little brother, V.S., explained to a detective, he was playing video games at his home with a friend until around 2:00 a.m. At some point that night, S.S. and defendant "come in the door." V.S. asked "where they were at" and "they just said that they had went to this person's party." Around this time, M.L. sent the following message

7

to S.S. on Instagram:  "I'm not stupid.  You walked in with that nigga and got off with that nigga.  My fucking bro gone.  He was trippin cause the music I was playing."

Defendant was arrested at S.S.'s house later in the morning.  A "blue zip-up" hooded sweatshirt was found during a search of the house.  This sweatshirt had a yellow Polo symbol as witnesses described.  DNA matching defendant's profile was extracted from the sweatshirt.  Gunpowder residue was also found on a sample collected from the right front cuff of the sweatshirt.

## DISCUSSION

### I.  African-American Prospective Jurors Excused for Cause

Defendant contends the trial court prejudicially abused its discretion and violated his federal constitutional right to a jury selected from a fair cross-section of the community by excusing two African-American prospective jurors for cause, based on their belief that the criminal justice system treats African-Americans unfairly and because they were sympathetic towards defendant.  As we shall discuss, the trial court excused the two prospective jurors because it concluded they could not be impartial.  Their voir dire testimony supported a finding that they could not decide the case solely on the evidence without regard to sympathy to defendant.  On this record, we cannot conclude the court abused its discretion.  Nor was defendant's constitutional right to a jury drawn from a fair cross-section of the community violated.

### A.  Additional Background

During voir dire, defense counsel asked the panel of prospective jurors whether anyone had any negative experiences with law enforcement.  Prospective Juror No. 1 responded:  "I have a concern with law enforcement in general."  She continued: "Especially in this day and age, and particularly because I have two young adult sons and two young adult stepsons.  So I'm concerned daily for any interaction that they might come in contact with law enforcement officers."  Defense counsel followed up:  "Okay.  And I don't want to politicize my conversation with you or the rest of the group.  But

8

acknowledging that, the real issue is — is will that not allow you to be fair to — let's say if an officer gets on the stand?" Prospective Juror No. 1 answered: "I feel like I could be fair."

Defense counsel then asked if there was anything else she thought the court and parties should know. Prospective Juror No. 1 answered: "I would say that just recently I was at — not participating but just observing a demonstration. And there was — and I'm sure it was probably their job, but there was just a standoffish type of environment between the people who were demonstrating and the officers. And they just — they didn't seem approachable. And like I say, I wasn't participating. I was only observing. But even from an — from my perspective, they just seemed not . . . approachable." Defense counsel asked whether she would be less likely to believe a police officer's testimony if the officer "appear[ed] standoffish on the stand." She responded: "I may think that I might not like him just on a first appearance type of thing, but that doesn't mean that I would think that he wouldn't be credible or believable."

In response to these answers, defense counsel stated: "It sounds like you're guarded about law enforcement as it relates to your young people in your life, the four young African-American males." Prospective Juror No. 1 responded: "Concerned more than guarded, yes." Following up, defense counsel asked: "So my client is African-American and he appears to be young. Is that going to — everything that we've just kind of talked about, *do you think you would be swayed to be more sympathetic to [defendant]?"* She answered: *"Probably, because he's probably about my children's age. So it's possible."* Defense counsel responded, "And I appreciate that. That's why we're here. We're trying to — *this may not be the best trial for you, right, because of everything. And that's fine.* So that's the question for you. Counsel then asked: "If everything was equal, at the end of this trial, let's just say that, and the evidence and the presentation and all that sort of thing, *is the fact that he reminds you of your boys going to sway you to vote our direction and that being the only reason that you would vote for*

9

*us*?" Prospective Juror No. 1 answered: "All things being equal, I can't say that it would sway me, but *it would be something that I would consider*." (Italics added.)

Defense counsel thanked Juror No. 1 for her answers and then asked the panel if anyone else had similar concerns. Prospective Juror No. 5 responded: "I would have the same feelings just — and concern." Defense counsel responded that having those concerns was fine, but asked: "Is that going to keep you from being fair to [the prosecutor] in her presentation, to the witnesses that she puts on, will that sway your opinion of that evidence at all towards my presentation, my evidence, with [defendant] just sitting there?" She answered: "I don't think that it will."

During the prosecution's voir dire, the prosecutor picked up this line of questioning, telling the panel: "Something that [Prospective Juror No. 1] said. She brought up something that is very political in the current society right now. A young [B]lack male. We are not blind. We know that [defendant] — what his race is. You can also kind of guess about how old he may be. And she was honest enough to say she has some concern. I believe [Prospective Juror No. 5] said she also had some concerns." The prosecutor then asked if anyone else felt the same.

Prospective Juror No. 9 answered: "I do. Yes." She explained: "*Just because the defendant also is about — around — probably around the same age as my half-brother. And also, too, I have concerns as well too about the stuff that's going on right now, being able to be swayed one way or the other*." The prosecutor asked: "*Do you feel that that would enter into your deliberations if you were to sit as a juror?*" She responded: "*I do believe so. Yes*." The prosecutor followed up: "If the defendant was of a different race or ethnic background, would you have those same concerns?" Prospective Juror No. 9 answered: "Probably not." (Italics added.)

The prosecutor then asked the same question of Prospective Juror No. 5. She said she would have similar concerns about "police brutality in the community" if defendant was Hispanic, or any race or ethnicity other than White, but not if defendant was White.

10

Turning to Prospective Juror No. 1, the prosecutor asked: "You said that if you were chosen as a juror and you were sitting in the jury deliberation room, that that might enter into your deliberations. You might be swayed. [¶] What if the defendant were of a different race or ethnic background? Or specifically, let's say if the defendant were [W]hite." Prospective Juror No. 1 answered: "For me personally, it would be different because I wouldn't be able — I wouldn't as easily be able to identify with that, someone who was [W]hite, *reminding me of my children*, as I am with — in this current situation. [¶] So it would still have an impact because I would see it as a young life. But I wouldn't see — I wouldn't as easily — *I wouldn't be able to as easily visualize my child in that situation.*" (Italics added.) The prosecutor followed up with, "*So because you have children who may be of similar age, that's what your concern is*?" Prospective Juror No. 1 replied: *That's part of it, yes.*" (Italics added.)

The prosecutor challenged all three prospective jurors for cause based on their statements regarding what the prosecutor referred to as "the current state of affairs as relates to law enforcement and the perception about interactions with African-American males."

Defense counsel responded, "all three of those persons are African-American or of African descent," and argued: "I think that people expressing their political concerns in an honest manner, precluding them from being on a jury or — or participating in jury service appears to be very dangerous. In other words, if you can't agree with law enforcement or like law enforcement to some extent, because there's been some perceived bad interactions with your racial group or your group, then you're precluded from participating in the justice system. That's how I immediately perceived it."

Defense counsel then specifically addressed Prospective Juror No. 1, arguing the potential for her to relate more with defendant because his race and age were similar to her own sons and stepsons would not support a challenge for cause. Turning to Prospective Juror No. 5, counsel argued there was even less support for a challenge for

11

cause with respect to her because "she stated she could be fair and it wouldn't be an issue." Counsel also opposed removing Prospective Juror No. 9 just because she expressed concerns about law enforcement abusing their power in relation to young men of color.

After hearing additional arguments from the prosecutor, the trial court excused Prospective Juror No 1, but not No. 5: "The Court finds sufficient basis to excuse Juror Number One for cause. The Court finds that she has expressed a potential bias and an inability to be impartial as relates to her duties as a selected juror. So Juror Number One is excused for cause. [¶] As relates to Juror Number Five, I agree with [the prosecutor's] representation in terms of Juror Number Five's characterization about having concern about anybody who would be of color. However, she did indicate that she would not be swayed. And so I do find thus far she has been able to demonstrate that she would be able to keep extraneous matters outside of the jury deliberation room should she be selected. So that one is denied."

As for Prospective Juror No. 9, the trial court brought her back into the courtroom for further questioning. She had responded to this issue only during the prosecution's voir dire, and defense counsel requested "further interaction" with her. The court questioned her first: "I wanted to take just a couple of moments to follow up on certain questions and answers that you gave. One question in particular was relative to have [sic] some thoughts about [defendant] being the same age and race as your half-brother . . . And indicating it would enter into your mind during deliberations." Prospective Juror No. 9 responded: "Yes, it would." The court then asked: So my question for you is: Does that mean you would not be able to limit your deliberations to only what was presented in this courtroom, or would you be considering other facts and circumstances, including the presentation of [defendant] and how he may appear to be like your half-brother? *Do you think you can separate the two and focus deliberations only on what's presented in this courtroom, or do you think otherwise*?" She answered: "*I think*

*otherwise*." In response to follow-up questioning, Prospective Juror No. 9 also stated: "*I would feel uncomfortable knowing that [defendant's] life would rest on my decision and what the jurors say, and I don't think I could live with that.*" (Italics added.)

Defense counsel was then permitted to follow up. He asked: "I'm just going to be blunt. *You don't want to be part — if you had to convict [defendant], you don't want to be part of that process*?" Prospective Juror No. 9 responded: "*That is correct. Yes.*" (Italics added.)

The trial court ultimately excused Prospective Juror No. 9 for cause.

## B. Analysis

On appeal, defendant asserts that because African-Americans have an unfavorable opinion about the treatment of African-Americans in the criminal justice system and will sympathize with African-American men being prosecuted, excluding African-American prospective jurors who express such sympathy results in a nonrepresentative jury.

### 1. Challenges for Cause and Standard of Review

A prospective juror may be excused for cause based on actual bias. (Code Civ. Proc. § 225, subd. (b)(1).) Actual bias includes: "the existence of a state of mind on the part of the juror in reference to the case, or to any of the parties, *which will prevent the juror from acting with entire impartiality, and without prejudice to the substantial rights of any party*." (Code Civ. Proc. § 225, subd. (b)(1)(C), italics added; *People v. Horning* (2004) 34 Cal.4th 871, 898.)

" '[W]hat constitutes "actual bias" of a juror varies according to the circumstances of the case.' " (*In re Manriquez* (2018) 5 Cal.5th 785, 799, quoting *People v. Nesler* (1997) 16 Cal.4th 561, 580 (*Nesler*).) The Attorney General points out the California Supreme Court has noted there is no particular constitutional test guiding what constitutes impartiality. He points to the following observation of our state's high court: "[i]n assessing whether a juror is 'impartial' for federal constitutional purposes, the United States Supreme Court has stated: 'Impartiality is not a technical conception. It is a state

13

of mind.  For the ascertainment of this mental attitude of appropriate indifference, the Constitution lays down no particular tests and procedure is not chained to any ancient and artificial formula.' " (*Nesler,* at p. 580, quoting *United States v. Wood* (1936) 299 U.S. 123, 145-146 [81 L.Ed. 78].)  But much has transpired since our high court's acknowledgment in *Nesler* in 1997 of the *Wood* court's observation from 1936 about there being no particular constitutional test.  In the context of the selection of jurors in death penalty cases, a well-settled constitutional standard has evolved, which seems equally applicable in non-capital cases:  a juror may be constitutionally excused for cause if the juror's views would " 'prevent or substantially impair' the performance of the juror's duties as defined by the court's instructions and the juror's oath." (*People v. Armstrong* (2019) 6 Cal.5th 735, 750 (*Armstrong*), citing *Wainwright v. Witt* (1985) 469 U.S. 412 [83 L.Ed.2d 841]and *Witherspoon v. Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776] (*Witherspoon*).)  The duties of a juror include the duty to set aside personal feelings and opinions and decide the case based solely on the evidence and instructions provided by the court.  (*Nesler*, at pp. 580-581, citing *Irvin v. Dowd* (1961) 366 U.S. 717, 722-723; See also CALCRIM No. 200.)  And one of the standard instructions given here and provided to all jurors in criminal cases contains the well-settled admonition not to let bias or sympathy influence their decision.  (CALCRIM Nos. 101, 200; See also *People v. Hawthorne* (1992) 4 Cal.4th 43.)

Ultimately, assessing juror qualifications falls within the trial court's broad discretion, and on appeal, reviewing courts " 'will uphold the trial court's decision if it is fairly supported by the record, and accept as binding the trial court's determination as to the prospective juror's true state of mind when the prospective juror has given conflicting or ambiguous statements.' " (*People v. Ledesma* (2006) 39 Cal.4th 641, 669.)  In other words, " ' " '[o]n review of a trial court's ruling, if the prospective juror's statements are equivocal or conflicting, that court's determination of the person's state of mind is binding.' " ' " (*People v. Clark* (2011) 52 Cal.4th 856, 895 (*Clark*); see also, *People v.*

14

*Soloman* (2010) 49 Cal.4th 792, 830 (*Soloman*); *People v. Weaver* (2001) 26 Cal.4th 876, 910 (*Weaver*).)  We afford this deference to trial courts out of recognition " 'that a trial judge who observes and speaks with a prospective juror and hears that person's responses (noting, among other things, the person's tone of voice, apparent level of confidence, and demeanor), gleans valuable information that simply does not appear on the record.' " (*People v. Avila* (2006) 38 Cal.4th 491, 529 (*Avila*); See also *Uttecht v. Brown* (2007) 551 U.S. 1, 9 [167 L.Ed.2d 1014].)

### 2.  Defendant's Constitutional Challenge

"[T]he right to trial by a jury drawn from a representative cross-section of the community is guaranteed equally and independently by the Sixth Amendment to the federal Constitution and by article I, section 16, of the California Constitution."  (*People v. Wheeler* (1978) 22 Cal.3d 258, 272 (*Wheeler*) [unconstitutional use of peremptory challenges], reversed on other grounds, *Johnson v. California* (2005) 545 U.S. 162 [162 L.Ed.2d 129]; see also *People v. Burgener* (2003) 29 Cal.4th 833, 855 [constitutional challenge to the jury pool].)  "The American tradition of trial by jury, considered in connection with either criminal or civil proceedings, necessarily contemplates an impartial jury drawn from a cross-section of the community.  [Citations.]  This does not mean, of course, that every jury must contain representatives of all the economic, social, religious, racial, political and geographical groups of the community; frequently such complete representation would be impossible.  But it does mean that prospective jurors shall be selected by court officials without systematic and intentional exclusion of any of these groups."  (*Thiel v. Southern Pac. Co.* (1946) 328 U.S. 217, 220 [90 L.Ed. 1181] (*Thiel*).)  Defendant cites *Thiel* in making the claim that the trial court's "procedure . . . rendered [defendant's] jury non-representative by systematically excluding a cognizable class from jury service."

In *Thiel*, the representative cross-section mandate was violated, and reversal was required, where the clerk of the court and the jury commissioner "deliberately and

intentionally excluded from the jury lists all persons who work for a daily wage." (*Thiel*, *supra*, 328 U.S. at p. 221.) The vice in *Theil* was a "blanket exclusion" of all daily wage earners based solely on the assumption that all such prospective jurors would claim financial hardship. (*Id*. at p. 224.) The high court recognized, however, there is no constitutional violation when a judge excuses a daily wage earner after determining that individual has a financial hardship. (*Ibid*.)

There is, similarly, no constitutional violation where a court determines a prospective juror cannot be impartial, for whatever reason. Under both the state and federal Constitutions, an accused is guaranteed the right to be tried by an impartial jury. (Cal. Const., art. I, § 16; U.S. Const., 6th & 14th Amends.) But there is no constitutional right to a jury consisting of jurors who are partial or biased in the accused's favor.

Defendant, however, argues "the superior court's procedure involved striking African-American jurors for cause if they said they might be influenced by their experiences and opinions regarding the harshness of the criminal justice system toward African-Americans." Such prospective jurors form a cognizable group, he maintains, because "many African-Americans . . . believe the criminal justice system treats African-Americans too harshly." Defendant reasons: "a procedure that strikes prospective jurors for cause based on such beliefs will necessarily result in striking many, if not most, African-American prospective jurors. Such a result is intolerable if the goal is to produce a racially and ideologically representative jury."

In making this argument, defendant relies primarily on a case from the District of Columbia Court of Appeals, *Mason v. United States* (2017) 170 A.3d 182 (*Mason*). While we agree with aspects of the *Mason* court's decision, *Mason* is factually distinct and does not help defendant.

In *Mason*, in response to the trial court's voir dire question about immediate family or close friends that had been arrested for, charged with, or convicted of a crime, a prospective juror stated her brother had such an experience in Texas. She said the family

suspected it was the result of racial profiling, and he had been treated unfairly. (*Mason*, *supra*, 170 A.2d at p. 185.) When asked whether her views about her brother would affect her ability to be impartial in the case, she responded: "I mean *I think I can be impartial*. I mean I think it's shaped my view of the world. *But I don't know the details of this case. I don't think I would see my brother in it. His situation is different*. But I definitely, that's my experience with the system." (*Ibid.*, italics added.) When the prosecutor asked if she thought African-American men were treated unfairly in D.C., the juror responded she thought they were, and "things are tilted in the wrong direction." On the prosecution's motion, the trial court excused the prospective juror for cause. (*Ibid.*) *Mason* held this was error. (*Id.* at p. 187.)

As defendant here points out, the court in *Mason* took note of a 2013 study indicating "68% of [African-Americans] believed that [they] are treated less fairly than [W]hites in the courts." (*Mason, supra,* 170 A.3d at p. 185) The court also noted "concern about the racial fairness of the criminal-justice system" has been "repeatedly expressed" by "courts and other official bodies."[9] (*Id.* at p. 186.) It concluded the improper exclusion of a prospective juror solely because of such a belief required reversal, notwithstanding the general rule that reversal is not required for the erroneous excusal of a prospective juror so long as the jury ultimately seated is fair and impartial. (*Id.* at p. 188.) In so concluding, the court relied in part on Supreme Court authority requiring reversal of a judgment of death where "capital-sentencing jurors were

---

[9] As Justice Liu recently noted, based on a more recent study by the Pew Research Center, "a substantial majority of Americans believe the criminal justice system treats Blacks less fairly than whites"— "84% of Black respondents, 63% of white respondents and 67% of all respondents in a survey of 6,637 adults." (*People v. Tripplett* (2020) 48 Cal.App.5th 655, 688-689, dis. statement regarding denial of review of Liu, J., citing Horowitz et al., Pew Research Center, Race in America 2019 (Apr. 9, 2019) pp. 11, 46.)

erroneously disqualified on the basis of their views about the death penalty." (*Id*. at p. 189; citing *Witherspoon supra,* 391 U.S. 510, 521-522.)

The *Mason* court articulated a rule with which we agree: "*Standing alone*, the belief that the criminal-justice system is systemically unfair to blacks is not a basis to disqualify a juror."[10] (*Mason, supra,* 170 A.3d at p. 187, italics added.) The *Mason* court explained: "[T]hat belief is neither uncommon nor irrational. Moreover, there is no basis for an inference that potential jurors holding that belief are necessarily unable to be impartial. To the contrary, potential jurors who hold that belief might well be particularly attentive to making sure that they perform their function impartially." (*Id*. at p. 187.) We agree with that as well. But we also agree with the *Mason* court's observation: "It is possible that a potential juror who believes that the criminal-justice system is unfair to blacks might respond to that belief by having difficulty being impartial. Where a trial judge makes that finding based on an adequate record, the potential juror can appropriately be disqualified for cause." (*Id*. at p. 187.) We conclude that is what happened here.

Prospective Juror No. 9 was unequivocal about her inability to be impartial. In addition to her general concerns about law enforcement, she indicated the fact that defendant reminded her of her half-brother would influence her decision making. When asked if her thoughts about defendant being the same age as her half-brother "would enter

---

[10] We note this rule is consistent with new provisions concerning peremptory challenges in Assembly Bill 3070 (Stats. 2020, ch. 318, §§ 1-3), enacted in 2020 and operational January 1, 2022. Under Civil Code of Procedure section 231.7, subdivision (e)(1)-(3), "[e]xpressing a distrust of or having a negative experience with law enforcement or the criminal legal system," "[e]xpressing a belief that law enforcement officers engage in racial profiling or that criminal laws have been enforced in a discriminatory manner," and "[h]aving a close relationship with people who have been stopped, arrested, or convicted of a crime" are presumptively invalid reasons for exercising a peremptory challenge against a prospective juror who is a member of a cognizable group.

18

into her mind during deliberations," she responded: "Yes, it would." The court sought to clarify: "Does that mean you would not be able to limit your deliberations to only what was presented in the courtroom, or would you be considering other facts and circumstances, including the presentation of [defendant] and how he may appear to be like your half-brother? Do you think you can separate the two and focus deliberations only on what's presented in this courtroom, or do you think otherwise?" She responded: "I think otherwise." In response to further questions, she stated: "I would feel uncomfortable knowing that [defendant's] life would rest on my decision and what the jurors say, and I don't think I could live with that." And when asked, "if you had to convict [defendant], you don't want to be part of that process?" Prospective Juror No. 9 responded: "That is correct. Yes." These responses support the trial court's conclusion that Prospective Juror No. 9 could not be impartial in this case.

A second reason also supported the prosecutor challenge to Prospective Juror No. 9 for cause: she stated she would not be able to look at graphic photographs. The prosecutor asked the panel about unpleasant photographs during the prosecution's voir dire, and defense counsel asked about it when Prospective Juror No. 9 was brought back into the courtroom. Immediately after responding to defense counsel's question, the trial court excused her.[11] In short, sustaining the challenge as to Prospective Juror No. 9 was not a close call.

---

[11] During the prosecution's voir dire, the prosecutor asked the panel whether any of them were concerned about looking at unpleasant or graphic photographs that would be part of the evidence the jury would be required to consider. After two other jurors expressed such a concern, Prospective Juror No. 9 responded: "The same. Pretty queasy when I look at gross stuff." The prosecutor asked: "Understanding that you're queasy, will you be able to follow your obligation to look at the evidence if that was part of the evidence?" Prospective Juror No. 9 answered: "Probably not, no." When she was brought back into the courtroom for additional voir dire, after asking about her not wanting to be part of the process of convicting defendant, defense counsel asked: "There are going to be photographs — or there will be photographs of something that may be shocking. [¶]

19

Prospective Juror No. 1 provided more equivocal responses regarding her ability to be impartial. After expressing "a concern with law enforcement in general," adding "particularly because I have two young adult sons and two young adult stepsons," she nevertheless stated that she felt she "could be fair" to any police officer who took the witness stand. She then described her experience at a demonstration, where police officers appeared "standoffish." But she indicated this would not make her less likely to believe an officer's testimony. Still, she acknowledged her concern for the young African-American men in her family regarding their interactions with law enforcement and further acknowledged she would "probably" be swayed to be more sympathetic to defendant because, as she put it, "he's probably about my children's age."

At this point, after acknowledging "this may not be the best trial for you," defense counsel asked: "If everything was equal, at the end of this trial … is the fact that he reminds you of your boys going to sway you to vote our direction and that being the only reason that you would vote for us?" Prospective Juror No. 1 answered: "All things being equal, I can't say that it would sway me, *but it would be something that I would consider*." (Italics added.) The prosecutor later asked: "You said that if you were chosen as a juror and you were sitting in the jury deliberation room, that that might enter into your deliberations. You might be swayed. [¶] *What if the defendant were of a different race or ethnic background? Or specifically, let's say if the defendant were [W]hite*." Prospective Juror No. 1 answered: "For me personally, it would be different because I wouldn't be able — I wouldn't as easily be able to identify with that, someone who was [W]hite, reminding me of my children, as I am with — in this current situation. [¶] So it would still have an impact because I would see it as a young life. But I

---

And is it your position that you can't even for 30 seconds look at them?" Prospective Juror No. 9 responded: "No." Counsel began to follow-up: "—digest them and then move on?" She responded: "No, not at all." It was then that the trial court excused Juror No. 9.

wouldn't see — I wouldn't as easily — *I wouldn't be able to as easily visualize my child in that situation*." (Italics added.) When the prosecutor followed up with, "*So because you have children who may be of a similar age, that's what your concern is?*" She replied: "*That's part of it, yes.*" (Italics added.)

Prospective Juror No. 1 did not explicitly state that she would be swayed to vote to acquit defendant either because of her concerns about the treatment of young men of color in the criminal justice system or because defendant reminded her of her children, but she did state the latter reason would "probably" sway her to be more sympathetic towards him. And as noted, she expressly stated the fact defendant reminded her of her family members "would be something that I would consider" and later stated the fact that she had children of a similar age was "part of" her concern. A decision based on such considerations would not be one based solely on the evidence and instructions. Indeed, such a decision would not be consistent with the instruction not to be influenced by bias or sympathy in decision making. (CALCRIM Nos. 101, 200)

On this record, we cannot say the trial court abused its discretion in excusing Prospective Juror No. 1. At no point did Prospective Juror No. 1 assure the court her ultimate decision would not be swayed by sympathy or her bias toward people who reminded her of her loved ones. Indeed, Prospective Juror No. 1 stands in contrast to Prospective Juror No. 5, the African-American the trial court refused to excuse for cause. When asked whether her general concerns about how African-Americans are treated by the justice system would keep her from being fair to the prosecutor or sway her opinion about the evidence towards defendant, Prospective Juror No. 5 said, "I don't think that it will." The trial court, being present in the courtroom and observing Prospective Juror No. 5's demeanor and presentation when she gave that response, must have credited the juror's assessment of her state of mind, because the court denied the prosecution's challenge for cause.

21

Likewise, the trial court could also observe Juror No. 1's demeanor and presentation. Additionally, the court heard her tone of voice and was in a position to glean her level of confidence from what the court observed and heard. (*Avila*, *supra*, 38 Cal.4th at p. 529.) With these advantages over us, the trial court found that Juror No. 1 could not impartial. We defer to the court's determination under these circumstances, because the trial court is in the best position to determine the potential juror's true state of mind. (*Uttecht*, *supra*, 551 U.S. at pp. 7-10 ["Deference is owed regardless of whether the trial court engages in explicit analysis regarding substantial impairment; even the granting of a motion to excuse for cause constitutes an implicit finding of bias"]; *Clark*, *supra*, 52 Cal.4th at p. 895; *Avila*, at p. 529.) And, as our high court's well-settled rule mandates, if the prospective juror's statements are ambiguous, equivocal or conflicting, the trial court's determination of the prospective juror's state of mind is binding. (*Clark*, at p. 895; *Soloman*, *supra*, 49 Cal.4th at p. 830; *Ledesma, supra,* 39 Cal.4th at p. 668; *Weaver*, *supra*, 26 Cal.4th at p. 910.)

Nevertheless, it bears noting that, "[o]ther than voting, serving on a jury is the most substantial opportunity that most citizens have to participate in the democratic process." (*Flowers v. Mississippi* (2019) ___ U.S. ___ , ___; 139 S.Ct. 2228, 2238 [204 L.Ed.2d 638] [addressing discriminatory peremptory challenges].) African-American prospective jurors have an equal protection right not to be excused from jury service based on the assumption they will be biased towards an African-American defendant. (*Foster v. Chatman* (2016) 136 S.Ct. 1737, 1741-1742 [same]; *Batson v. Kentucky* (1986) 476 U.S. 79, 97-98 [90 L.Ed.2d 69] [same].) Trial courts should be careful to ensure that jurors' equal protection rights to participate in our democracy are not violated. Still, when a prospective juror's state of mind would prevent or substantially impair the performance of his or her duties as a juror in accordance with the instructions and oath (see *Armstrong*, *supra,* 6 Cal.5th at p. 750; *Clark, supra,* 52 Cal.4th at p. 895), the juror may be constitutionally excused for cause. The record here supports a finding that

22

Prospective Jurors No. 1 and No. 9 were substantially impaired by their bias and sympathy.[12]  Giving the deference to the trial court our high court has said we must give, we conclude the trial court did not abuse its discretion by excusing them, and defendant's constitutional right to a jury drawn from a representative cross-section of the community was not violated.

## II.  Dismissal of a Seated Juror During Trial

Defendant contends the trial court prejudicially abused its discretion in discharging a sitting juror for dishonesty during trial.  We conclude the trial court erred because the juror's inability to perform his duty does not appear in the record as a demonstrable reality.  The error, however, was harmless.

## A.  Additional Background

On the tenth day of trial, before bringing in the jury for the afternoon session, the trial court stated that an interaction between a juror and a colleague of defense counsel needed to be placed on the record.  That colleague, attorney Steven Taxman, was present in the courtroom.  Taxman explained that he went to a coffee shop near the courthouse early that morning to do some work before going to court.  A person Taxman later realized was Juror No. 2 was also doing some work at the coffee shop.[13]  Taxman described the interaction to the trial court.

Taxman said he sneezed and the man said, " 'God bless you.' "  Taxman said he thanked the man and told the court the following transpired:  "I just chatted with him for

---

[12]  Likewise, the record also supports a finding under Code of Civil Procedure section 225, subdivision (b)(1)(C), that Prospective Jurors No. 1 and No. 9 had a "state of mind" which would have prevented them "from acting with *entire* impartiality, and without prejudice to the substantial rights of any party."  (Italics added.)

[13]  Taxman explained that he realized the person was Juror No. 2 when he came to court later in the day and saw him coming out of one of the courtrooms with the rest of the jury.  He then notified defense counsel about the interaction.

23

a second.  And I said, 'You like working here?  It's a great place to work.'  And he goes, 'Oh, yeah, I'm just working here because *I'm on jury duty*.'  And I'm like, 'Oh.'  And I didn't identify myself as an attorney.  I said, 'Well, I hope you have a really nice experience doing that.  It was nice talking with you.'  And he said, 'Well, yeah, it's nice, but *I'm looking forward to it being over*.'  And that was it."  (Italics added.)  Taxman said once he heard the man was a juror, there was no reason to talk to him.  When Taxman left the coffee shop, he told the man, " 'Have a nice day.' "

The court asked Taxman follow-up questions about his chat with the juror.  Changing his rendition slightly, Taxman said:  "I asked him if he liked working here because he was working on his computer and so was I.  So we were both kind of working away.  And then that was the extent of the discussion until I sneezed.  I sneezed.  And he said, 'God bless you.'  And I said, "Thank you."  And I said, 'Do you like working here?'  And that's when he told me what he did and the reason why he was working there was because he was on *jury duty*.  And then when I heard that, I didn't talk to him any more about anything, other than I just said, 'I hope you enjoy your experience.  It should be a rewarding experience.'  And he said '*I'm looking forward to it being over*.' "  (Italics added.)

The trial court noted that many jurors "for a variety of reasons look forward to their jury service being over" and asked for comments from the prosecutor and defense counsel.  The prosecutor asked to have Juror No. 2 discharged noting "two occasions where Mr. Taxman approached [defense counsel] while the jury was [in the courtroom]" and engaged in "friendly interaction," which would have indicated to the jury "that they were either friendly, or associated, or something to that effect."[14]  In response, defense

---

[14]  The prosecutor said her request to discharge Juror No. 2 was being made "In conjunction with everything that happened this morning."  At the beginning of the morning session, Juror No. 2 volunteered to the court that he was acquainted with S.S.'s

counsel acknowledged, "Mr. Taxman did come and approach me — I think maybe it was upwards of three times — while I was at counsel's table. And I do remember him putting his hand on my shoulder once. Whether or not the jurors saw something, I don't know." Defense counsel argued the "coincidental" interaction between Taxman and Juror No. 2 at the coffee shop, coupled with the possibility jurors saw Taxman and defense counsel were friendly colleagues, while "a little awkward," did not support removal of the juror.

The trial court decided to hear from Juror No. 2 and asked counsel if there was any objection. Both the prosecutor and defense counsel said they had none. Defense counsel noted Juror No. 2 might not even remember the interaction.

The trial court asked the juror: "I understand you had a brief interaction with some person over at the cafe, restaurant, little deli over on G Street this morning. Do you recall that, sir?" Juror No. 2 answered: "Nothing other than 'hello' or ordering my food." The trial court then asked: "Do you recall making any comments to any of the other persons inside the [coffee shop] about *looking forward to this trial being over*?" (Italics added.) Juror No. 2 answered: "No." The trial court then asked: "Do you recall interacting with another male patron who was working on his computer and may have sneezed? To that question, Juror No. 2 responded: "I do." Asked what he recalled about that, Juror No. 2 explained: "I think we were both on our laptops. And he said it's a good place to get work done. And I said, 'Yeah, I come here in the morning.' I've been

father from their work in separate non-profits. He explained he did not know her father personally, their non-profits had only interacted three times, and he had not recognized S.S.'s name from the witness list because when the name was read, it had been mispronounced. He said when he realized he knew S.S.'s father, his reaction was "I gotta tell somebody." He, however, indicated his acquaintance would not affect how he evaluated S.S.'s testimony. The prosecutor stated a preference to excuse Juror No. 2, but acknowledged the matter did not rise to the level of cause. The court stated: "I found [Juror No. 2's] responses to be candid and thoughtful" and I don't think it rises to the level of cause." It then ruled: "I find that he will be able to faithfully perform his duties, assess the facts, and apply the law as I give it to him. So I'm going to allow him to remain."

there every morning to get my work done before I go to the courthouse." Asked whether he recalled "anything else being said," the juror answered: "No."

After questions about whether he was wearing his juror badge, the court asked: "Anything else that you recall about that interaction, that exchange, what he may have said to you or what you might have said to him, sir? The juror responded: "No. I had my headphones on. And I was — I actually wasn't on the phone but I was — I leave the headphones on so people don't talk to me. And I remember he said something and I took the headphones off and we talked about it being a good place to get work done." The court asked, "Do you remember how the conversation ended, *parting words*?" (Italics added.) Juror No. 2 responded: "I said 'have a good rest of your day.' " The court concluded, "And that's all you recall?" to which the juror responded, "That's all I recall." Neither counsel had additional questions.

After Juror No. 2 was excused from the courtroom, the trial court asked for additional comments from counsel. The prosecutor responded: "What concerns me is that we have a differing account. Mr. Taxman represented that he specifically said that he was looking forward *to the trial* being over. I'm not certain why he would make that up. So I would tend to believe him. I can't see why he would draw that and bring this up as an issue [Juror No. 2] is denying. That was a direct question from the Court, and he specifically denied that. That concerns me." The trial court asked the prosecutor: "What if [Juror No. 2] denied it because it was so insignificant he simply didn't recall it?" The prosecutor expressed disbelief of that conclusion and pointed to the fact Juror No. 2 remembered other particulars of the conversation — the sneezing, being on his laptop, the conversation about the coffee shop being a good place to work and having his headphones on. The prosecutor added: "But the one thing that he should not be doing is talking about anything regarding — jury duty is the one thing he says he does not remember."

The trial court then heard from defense counsel: "It just appeared to me, for what it's worth, that he was a little startled and had a little bit of memory recall problems at the beginning of your conversation — with you being the Court — in what seemed innocent, and he slowly started to recall the more that came out. [¶] I'm submitting, your Honor. I think it's harmless." Neither the court, nor the prosecutor disagreed with counsel's observation regarding the juror's gradual memory recall.

After a brief recess, the trial court stated it probably should have taken Taxman's statement under oath and perceived the need to do that. The court then shared its tentative thinking, stating there was no reason to believe Taxman was lying about his interaction with the juror, "[a]nd if that's the case, then I have a record that *suggests* this juror is not being truthful. And the Court, I think, is forced into a scenario where there would be cause to excuse him." (Italics added.)

Later, when Taxman returned to the courthouse, he was placed under oath. The court asked Taxman to "reiterate [his] interaction" with Juror No. 2. Taxman gave a slightly different rendition this time. He stated after he got to the coffee shop, he went to a table where Juror No. 2 was seated. Taxman explained: "He had all his things out on the table, doing computer work, and so was I. So I was doing computer work. He was doing computer work. I was minding my own business. He was minding his own business. I didn't see a juror badge. [¶] So I sneezed. And he said, " 'God bless you.' " Taxman said he was impressed that a stranger would say that so he felt obligated to talk to him. Taxman continued: "And I said, 'Oh, do you like working here, too?' And he goes, 'Yeah, I like working here, but I'm on *jury duty*.' *He said 'jury duty*.' And I said to him, 'Oh, are you on a panel? Are they selecting, or are you on a case?" And he said, 'I'm on a case.' And when I heard him say, 'I'm on a case,' I'm like — I cut off the conversation. I didn't want to have anything more to say to him and I didn't say anything. I think I went back to computing. And I said something like, 'Well, I hope you really enjoy your experience. It should be very rewarding.' And he said something like,

'Yeah, I'm looking forward to *it* being over.' And I said, 'Have a nice day. It was nice talking to you.' And then I left and went to court. And that was it." (Italics added.)

After Taxman was excused, the court ruled, stating: "Based on the information provided by Mr. Taxman, particularly under oath, this Court finds that *there are questions regarding the truthfulness of Juror Number Two*. The Court is going to thank and excuse Juror Number Two from the jury." (Italics added.)

## B. Analysis

### 1. Excusing Seated Jurors for Cause

Penal Code section 1089 authorizes a trial court to discharge a seated juror, "If at any time, whether before or after the final submission of the case to the jury, a juror dies or becomes ill, *or upon other good cause* shown to the court *is found to be unable to perform his or her duty*." (Italics added.) Thus, before excusing a seated juror, the trial court must find there is good cause to believe the juror is unable to perform his or her duty.

"[A]n appellate court's review of the decision to remove a seated juror is not conducted under the typical abuse of discretion standard, but rather under the 'demonstrable reality' test." (*People v. Fuiava* (2012) 53 Cal.4th 662, 711.) The demonstrable reality test "requires a 'stronger evidentiary showing than mere substantial evidence.' " (*People v. Wilson* (2008) 44 Cal.4th 758, 821, citing *People v. Cleveland* (2001) 25 Cal.4th 466, 488 (*Cleveland*), conc. opn. of Werdegar, J.) Our high court in *Wilson* emphasized: " 'To dispel any lingering uncertainty, we explicitly hold that the more stringent demonstrable reality standard is to be applied in review of juror removal cases. That heightened standard more fully reflects an appellate court's obligation to protect a defendant's fundamental rights to due process and to a fair trial by an unbiased jury.' " (*Wilson*, at p. 821.)

In *Armstrong*, our high court further clarified the demonstrable reality test, contrasting it to the substantial evidence test: " 'A substantial evidence inquiry examines

28

the record in the light most favorable to the judgment and upholds it if the record contains reasonable, credible evidence of solid value upon which a reasonable trier of fact *could* have relied in reaching the conclusion in question. . . . [¶] The demonstrable reality test entails a more comprehensive and less deferential review. It requires a showing that the court as trier of fact *did* rely on evidence that, in light of the entire record, supports its conclusion that [good cause for removing the juror is] established. It is important to make clear that a reviewing court does not *reweigh* the evidence under either test. Under the demonstrable reality standard, however, the reviewing court must be confident that the trial court's conclusion is manifestly supported by evidence on which the court actually relied. [¶] In reaching that conclusion, the reviewing panel will consider not just the evidence itself, but also the record of reasons the court provides." (*Armstrong*, *supra*, 1 Cal.5th at pp. 450-451.)

We distill the following summary from our high court's explanation of the demonstrable reality test set forth above: (1) The demonstrable reality test is a heightened standard requiring a stronger evidentiary showing than the substantial evidence test, which looks at the evidence in a light most favorable to the judgment; (2) however, like the substantial evidence test, reviewing courts do not reweigh the evidence; (3) but a reviewing court must look only to the evidence upon which the trial court actually relied in determining whether the trial court's decision is supported by the evidence; thus reviewing courts may not base their decision on evidence upon which the trial court did not actually rely; (4) in addition to the evidence upon which the trial court relied, a reviewing court must consider the reasons the trial court gives for its ruling; (5) because a reviewing court must consider "the record of the reasons the trial court provides," reviewing courts cannot imply findings the trial court did not expressly make; and (6) because a reviewing court cannot imply findings, the trial court should expressly state its reasons for discharging the juror, including demeanor-based reasons and credibility findings. As to this last point, our high court said some time ago: "A trial

29

court facilitates review when it expressly sets out its analysis of the evidence, why it reposed greater weight on some part of it and less on another, and the basis of its ultimate conclusion . . . In taking the serious step of removing a . . . juror the court must be mindful of its duty to provide a record that supports its decision by a demonstrable reality." (*People v. Barnwell* (2007) 41 Cal.4th 1038, 1053 [removal of sitting juror for deliberation misconduct].)

### 2. Propriety of the Trial Court's Investigation

Defendant first argues the trial court abused its discretion by inquiring into Juror No. 2's ability to continue to serve on the jury because "a hearing is required only where the court possesses information which, if proven to be true, would constitute 'good cause' to doubt a juror's ability to perform his [or her] duties," citing *People v. Ray* (1996) 13 Cal.4th 313, 343 (*Ray*). According to defendant, Taxman's summary of his coffee shop conversation with Juror No. 2 was insufficient to justify the juror's removal and thus, the court's investigation was improper.

This argument is forfeited. Defense counsel was asked whether he objected to the trial court questioning Juror No. 2 and answered: "No." The failure to object forfeits the assertion that the questioning itself amounted to a prejudicial abuse of discretion. (See *People v. Wilson* (2008) 43 Cal.4th 1, 25, abrogated on another point as stated in *People v. Johnson* (2018) 6 Cal.5th 541, 587.)

And even if preserved, we would conclude the trial court did not err by conducting an investigation. As our high court noted in *Ray*, "[t]he decision whether to investigate the possibility of juror bias, incompetence, or misconduct . . . rests within the sound discretion of the trial court." (*Ray*, *supra*, 13 Cal.4th at p. 343.) And as the trial court noted here, jurors might look forward to their jury duty being over for a "variety of reasons." It was within the court's discretion to determine whether Juror No. 2 had outside life circumstances that might make it difficult to perform his duty such that there would be good cause to discharge him under section 1089.

But that is not the direction the investigation took, and defendant has not forfeited his assertion that the trial court abused its discretion in discharging Juror No. 2, so we turn to that ruling.

### 3. Demonstrable Reality Analysis

The Attorney General acknowledges that the demonstrable reality test applies here. He notes that a lack of candor during voir dire may lead to discharge of a juror under section 1089 when the false or misleading nature of voir dire statements comes to light during trial. (See *People v. Johnson* (1993) 6 Cal.4th 1, 22, abrogated on another point in *People v. Rogers* (2006) 39 Cal.4th 826, 879; *In re Hitchings* (1993) 6 Cal.4th 97, 110-114 (*Hitchings*).) He further argues "[t]here is no reason to treat a juror's untruthful answers given during a mid-trial hearing any differently."

On the contrary, there is good reason to treat this situation differently. As our high court explained in *Hitchings*, a prospective juror who conceals material facts or gives false answers during voir dire deprives both sides of the right to intelligently exercise for-cause and peremptory challenges and undermines the integrity of the jury trial process. (*Hitchings*, *supra,* 6 Cal.4th at pp. 110-112.) That is not a concern in the instant context.

Moreover, even in the context of voir dire statements, the law accounts for failure to recall and innocent mistakes. "[M]ere inadvertent or unintentional failures to disclose [during voir dire] are not accorded the same effect [as intentional concealment]. '[T]he proper test to be applied to unintentional "concealment" is whether the juror is sufficiently biased to constitute good cause for the court to find under [section 1089] that [the juror] is unable to perform his [or her] duty.' " (*People v. McPeters* (1992) 2 Cal.4th 1148, 1175, superseded by statute on another point as stated in *People v. Boyce* (2014) 59 Cal.4th 672, 707.)

Here, the purported failure to disclose related to a statement the juror made to a stranger about jury duty before court one morning. Contrary to the prosecutor's statement to the trial court, and the trial court's second question to Juror No. 2, the juror

never said he was looking forward to "the trial" being over. Juror No. 2 said he was looking forward to his "jury duty" being over. In his first rendition of the conversation, Taxman told the court Juror No. 2 said, " '*I'm on jury duty*,' " to which Taxman replied, " 'Well, I hope you have a really nice experience doing that," and Juror No. 2 responded, " 'Well, yeah, *it's* nice, but I'm looking forward to *it* being over.' " Taxman told the court, "that was it." (Italics added.) In his second and third renditions of the conversation, which were slightly different from the first, Taxman told the court that at some point after Juror No. 2 said he was on "*jury duty*," he told the juror something like, " 'Well, I hope you really enjoy your experience. *It* should be very rewarding,' " to which Juror No. 2 "said something like, 'Yeah, I'm looking forward to *it* being over.' " (Italics added.) In the context of Taxman's renditions, the "it" in Juror No. 2's statement referenced "jury duty." Taxman never said Juror No. 2 stated he was looking forward to the "trial" being over.

The nuance between "trial" and "jury duty" may seem unimportant, but it must be taken into account when evaluating Juror No. 2's response to the trial court's questions, which the Attorney General argues was dishonest. The second question the trial court asked Juror No. 2 was: "*Do you recall* making any comments to any of the other persons inside the [coffee shop] about looking forward to *this trial* being over?" (Italics added.) The evidence does not establish that his response of "No" was untrue.

First, the questioning took place during the afternoon session, after Juror No. 2 had been focused on the morning's testimony. And this particular question was posed before the trial court refreshed Juror No. 2's recollection about the morning conversation in the coffee shop by providing some of the circumstances, namely the reference to the person working on his computer and the sneeze. Indeed, defense counsel predicted Juror No. 2 might not remember the conversation and later told the court he thought Juror No. 2 was having "memory recall problems at the beginning," that "seemed innocent" and that "he slowly started to recall the more." There is no evidence in the record indicating the juror

32

should have immediately remembered the conversation he had with Taxman when the court asked the first two questions.  To the contrary, Juror No. 2 had been in a coffee shop, he had his headphones on, and was working on his computer — his usual morning routine during the trial — when he had an innocuous conversation with a stranger.[15]  It is not at all clear that Juror No. 2 truly did remember the conversation when the court asked him whether he recalled it in its first two questions.  And innocent misrecollection is not concealment or dishonesty.

Second, even assuming Juror No. 2 recalled having a conversation with a stranger, we must look to what he was asked about it.  In the trial court's second question, he was asked whether he recalled making a statement "about looking forward to the *trial being over*," but no evidence establishes that he ever made that statement.  He made a comment about looking forward to his "jury duty" being over.  Thus, if he did not make the statement he was asked about, there was no reason for him to recall it, and it was not untrue for him to say he did not recall it.[16]  Moreover, the trial court never asked Juror

---

[15]  Taxman himself called the conversation "very innocuous."

[16]  The decisional law suggests precision in questioning jurors during voir dire is important and a juror does not commit voir dire concealment misconduct when questions are imprecise.  (See *People v. Majors* (1998) 18 Cal.4th 385, 418-419 [juror did not commit voir dire concealment misconduct when he answered "no" to questionnaire question, "Are you or *any close friend* or relative associated with any federal, state or local law enforcement agency or other governmental office such as . . . the Department of Corrections," because the people the juror later referred to as "buddies" who worked for Corrections were actually only acquaintances and not "close friends"; juror did not commit misconduct when he answered "no" to question, "Do you know anyone whom you believe to be a drug user or seller?" because although his wife sold cocaine when she was a teenager, he did not know her at the time and he understood the question to related to present use or sale of drugs]; *People v. Dyer* (1988) 45 Cal.3d 26, 58-59 [juror did not commit misconduct by giving answer to an ambiguous question she believed to be true]; *People v. Blackwell* (1987) 191 Cal.App.3d 925, 929 [voir dire concealment misconduct turns in part on whether the question posed was unambiguous; voir dire questions must be "sufficiently specific to elicit the information which is not disclosed, or as to which a

No. 2 whether he, in fact, was looking forward to the trial or his jury duty being over. Such a question would have revealed how the juror was feeling as opposed to his memory of what had been said and could have resulted in an answer that might justify his dismissal under section 1089. Indeed, the court posed no questions that would have revealed if Juror No. 2 might have been distracted by outside life circumstances that might cause him to be unfocused during the testimony or deliberate more quickly than he might have otherwise.

As noted, the prosecution argued in the trial court that deception could be inferred from Juror No. 2's ability to remember conversation particulars but failed to recall the statement he is alleged to have made. The Attorney General makes the same argument on appeal. But the trial court did not base its decision on this inference, and under the demonstrable reality test, we do not evaluate the evidence in the light most favorable to the trial court's decision and accept all inferences that support that decision.[17] (*Armstrong*, *supra*, 1 Cal.5th at pp. 450-451) Rather, our focus must be on the evidence

---

false answer is later shown to have been given"]; *Cabe v. Superior Court* (1998) 63 Cal.App.4th 732 [partially responsive, but "literally true" response to a compound question cannot serve as the basis for a perjury charge against a juror related to alleged voir dire concealment].) Just as precision is important in posing voir dire questions, precision is also important in posing juror misconduct investigation questions.

[17] Moreover, the record more persuasively demonstrates that Juror No. 2 did not immediately recall the conversation in the coffee shop earlier that day, and it was the court's reminder of those details in its third question that refreshed his recollection. Furthermore, the record demonstrates Taxman's recall was not perfect either, as his three renditions were not one hundred percent consistent. Juror No. 2 was given only one opportunity to explain what happened that morning. In conducting a misconduct investigation regarding conversations, trial courts must be sensitive to the fact that human beings are not digital recorders and should not be expected to replay a conversation verbatim out of the blue, especially when the circumstances suggest the juror probably never thought he would be required to remember having the conversation, let alone exactly what was said.

34

upon which the trial court actually relied and the reasons the trial court gave for the decision. (*Ibid.*)

The only reasons the trial court gave for its ruling related to a perceived conflict between the accounts of Taxman and Juror No. 2 and the lack of evidence indicating Taxman had a motive to lie. Prior to having Taxman return to the courtroom, the court noted there was no reason to believe Taxman was lying, and then stated: "[a]nd if that's the case, then I have a record that *suggests* this juror is not being truthful. And the Court, I think, is forced into a scenario where there would be cause to excuse him." (Italics added.) Ultimately the court ruled: "Based on the information provided by Mr. Taxman, particularly under oath, this Court finds that *there are questions* regarding the truthfulness of Juror Number Two." (Italics added.) But the court merely ruled there were "questions" regarding Juror No. 2's truthfulness; it did not rely upon the inference the prosecutor argued and it never found that Juror No. 2 had lied or was dishonest.

The court's reluctance to specifically find that Juror No. 2 lied is understandable given the circumstances discussed *ante*. And without an express finding that Juror No. 2 was dishonest or concealed information, supported by evidence upon which the court actually relied, good cause to discharge him is not established to a demonstrable reality.

At best, the evidence established that Juror No. 2 was looking forward to his *jury duty* being over, a sentiment that does not strike us unusual for jurors in a lengthy trial, especially when trying to juggle work and perform their civic duty at the same time. Such a feeling did not signal that the juror could not perform his duty or was biased; nor did his failure to recall making such a statement establish he was unable to perform his duties.[18] Indeed, separate from the issue of his credibility, the statement Juror No. 2 is

---

[18] Nor did the fact that Juror No. 2 mentioned he was on jury duty to Taxman indicate he was unable to perform his duties. It is true that "[i]n appropriate circumstances a trial judge may conclude, based on a juror's willful failure to follow an instruction, that the

35

said to have made was not material to either the case or his ability to serve.**19**  It appears

the trial court presumed the worse of Juror No. 2.  But as this court has recognized, under

the demonstrable reality test, courts may not " 'presume the worst' of a juror." (*People v.*

*Bowers* (2001) 87 Cal.App.4th 722, 729 (*Bowers*).)

In this regard, the circumstances here are reminiscent of an earlier case where the

California Supreme Court discussed the demonstrable reality standard.  In *People v.*

*Compton* (1971) 6 Cal.3d 55, the trial court conducted a jury misconduct hearing

concerning a statement an alternate juror made to his barber during the weekend.  The

barber testified that the alternate disclosed his connection with the trial and said that

juror will not follow other instructions and is therefore unable to perform his or her duty
as a juror." (*Ledesma*, *supra*, 39 Cal.4th at p. 738.)  But contrary to the Attorney's
contention, Juror No. 2 did not violate the trial court's pretrial admonitions.  Prior to the
opening statements, the trial court instructed with the standard pre-trial instruction,
CALCRIM No. 101.  That instruction told the jurors:  "During the trial, do not talk about
the case or about any of the people or any subject involved in the case with anyone."  In
the mind of a layperson, a statement telling someone you are on jury duty but looking
forward to it being over might not fall into the prohibition of talking about the case, the
people in the case or a subject involved in the case.  And unless a juror's conduct violates
an express admonition, there is no misconduct.  "A lay juror cannot be expected to
conform to standards of behavior of which [they have] not been informed." (*In re*
*Hamilton* (1999) 20 Cal.4th 273, 305.)

**19**  The conversation with Taxman was de minimus and did not establish good cause for
his discharge under section 1089 based on an inability to perform his duty.  (See
*Armstrong*, *supra*, 1 Cal.5th at p. 452 ["de minimis references" to juror reading a book or
looking at a cell phone "one or two times" during deliberation insufficient to support a
finding juror was refusing to deliberate]; *People v. Stewart* (2004) 33 Cal.4th 425, 509-
511[Juror's misconduct was "trifling" and non-prejudicial when during break in penalty
phase of death penalty trial, juror, while in the restroom, spoke to defendant's ex-
girlfriend, telling her, "I know we're not suppose[d] to have any contact but I just wanted
to tell you're a very nice looking lady'']; *People v. Hardy* (1992) 2 Cal.4th 86, 175
[juror's unauthorized contact with prosecution police witness was improper, but was de
minimis under the circumstances of the case]; *People v. Salinas-Jacobo* (2019) 33
Cal.App.5th 760, 779 [even if the juror had brought up the issue of punishment during
deliberations, there is insufficient evidence that any consideration of it by him was any
more than de minimis, and was not a basis to discharge him for misconduct].)

certain older women had been rejected as prospective jurors " 'because they would be hard to keep an open mind on a case such as this and what the people that selected the jury didn't know, that he felt the same way,' " and that " 'he didn't like to be on a case like this because it was hard to keep an open mind.' " The trial court never asked the alternate about his statement before discharging him. (*Id*. at p. 59.) Our high court concluded the statements were equivocal: "[T]hey could have signified that [the alternate] was incapable of 'acting with entire impartiality' [Citation], but they could also have meant only that he found the facts of the case distasteful and would be compelled to make a special effort to remain objective, although he was capable of doing so. Yet the trial court did not question the person most likely to know that meaning, [the alternate] himself." (*Id*. at pp. 59-60.) Regarding the requirement in section 1089 of "good cause" to find the juror is "unable to perform his or her duty," our high court explained: "inability must appear in the record as a demonstrable reality. Here the ambiguity in [the alternate's] remarks was never resolved by proof, and *the court was not entitled to do so by presuming the worst*. Such a presumption, however well motivated, does not furnish the 'good cause' required by the governing statutes." (*Id*. at p. 60, italics added.) Thus, the trial court erred in excusing the alternate.[20]

Here, while the trial court asked Juror No. 2 a series of questions, most of the questions were prefaced with "do you recall" as opposed to "did you say. . ." or "did you tell the person . . ." And from his response that he did not recall making the statement the trial court had asked about, the court presumed the worst by discharging Juror No. 2,

---

[20] Apparently believing it could not proceed without an alternate, the trial court in *Compton* declared a mistrial. (*Compton*, *supra*, 6 Cal.3d at p. 58.) Apart from the error in discharging the alternate, our high court, as a secondary reason for its reversal, concluded that since the jury of 12 was still intact, the trial court could have proceeded without the alternate and there was no legal necessity to declare a mistrial. (*Id*. at pp. 60-61.)

finding there were "questions about his truthfulness." This was error. We conclude the juror's inability to perform his duties does not appear in the record as a demonstrative reality. (*Armstrong*, *supra*, 1 Cal.5th at p. 450.)

### 4. Harmless Error

This brings us to the question of prejudice. Applying the standard in *Watson, supra,* 46 Cal.2d at page 836, this court has held that an abuse of discretion in discharging a juror under section 1089 "requires reversal only if it is reasonably probable that a result more favorable to the defendant would have been reached but for the error." (*Bowers, supra,* 87 Cal.App.4th at p. 735.)

In *People v. Abbott* (1956) 47 Cal.2d 362 (*Abbott*), a seated juror was discharged before deliberations began because it came to light that he worked in the same office as the defendant's brother. Our high court, after holding the trial court did not abuse its discretion in discharging the juror under section 1089, also held "there is no showing [the defendant] was prejudiced." The court explained there was no prejudice because the defendant "was not entitled to be tried by a jury composed of any particular individuals," "[t]he juror who was substituted for [the discharged juror] was examined fully by both sides on *voir dire*, accepted as a qualified alternate and served as such from the start of the trial until seated as a regular juror," and "[t]here is no claim that he was unable to render a fair verdict." (*Id*. at pp. 371-372.)

By contrast, in *People v. Hamilton* (1963) 60 Cal.2d 105, 127 (*Hamilton*),[21] our high court held the trial court prejudicially abused its discretion in discharging a juror during the presentation of the penalty phase evidence of a capital trial after erroneously concluding the juror committed misconduct. On the question of prejudice, the court

---

[21] *Hamilton* was overruled in part on another point in *People v. Morse* (1964) 60 Cal.2d 631, at pages 637-638 and footnote 2, and disapproved on a different point in *People v. Daniels* (1991) 52 Cal.3d 815, at pages 864-866.

observed that its previous decisions in *Abbott* and *People v. Howard* (1930) 211 Cal. 322 "turned upon the fact that no prejudice had been shown." (*Hamilton*, at pp. 126-127.) In *Abbott*, there was no showing the discharged juror "would have been more favorable to one side or the other," and in *Howard*, "the discharged juror had expressed a prejudice against two defense witnesses" and therefore "substitution of an alternate in his place was favorable to the defense." (*Hamilton*, at p. 127.) But in *Hamilton*, the prosecution moved to discharge the juror in question "on the stated ground that she 'had disclosed her opposition to a verdict imposing the death penalty.' Thus, her disqualification could only be beneficial to the prosecution and prejudicial to the defense." (*Id*. at p. 128.) Our high court held: "This error alone could well be held to have been prejudicial and to require a retrial of the penalty issue. Certainly, when considered with the other errors . . . the cumulative effect of such errors must be held to be prejudicial." (*Ibid*.) Thus, it is clear from these older cases, that our high court requires a showing of prejudice when a trial court erroneously discharges a sitting juror under section 1089.

Defendant relies on *Cleveland*, *supra,* 25 Cal.4th 466 and *Armstrong*, *supra*, 1 Cal.5th 432, where our high court held the trial courts abused their discretion in discharging a juror during deliberations for refusing to deliberate because the record did not support such a conclusion as a demonstrable reality. (*Cleveland,* at p. 485; *Armstrong*, at pp. 450-454.) Citing *Hamilton*, without further analysis, the *Cleveland* court concluded the trial court's error in discharging the juror under section 1089 was prejudicial and required reversal of the judgment. (*Cleveland,* at p. 486.) Citing *Cleveland*, without further analysis, the *Armstrong* court concluded the error in that case was prejudicial and required reversal. (*Armstrong*, at p. 454.)

But as should be apparent from the *Cleveland* court's citation to *Hamilton*, our high court relied on *Hamilton's* discussion of prejudice in support of its conclusion the discharge of the juror was prejudicial. The fact that the *Cleveland* court did not specifically analyze prejudice does not imply a conclusion that prejudice need not be

39

shown.  To the contrary, the prejudice was obvious because, similar to *Hamilton*, the trial

court in *Cleveland* discharged the only juror who disagreed with his fellow jurors

regarding the defendant's guilt.  As in *Hamilton*, his disqualification "could only be

beneficial to the prosecution and prejudicial to the defense."  (*Hamilton*, *supra*, 60 Cal.2d

at p. 128; see also *Bowers*, *supra*, 87 Cal.App.4th at pp. 735-736 [discharged juror "was

the lone holdout juror who steadfastly held to his belief defendant was not guilty

throughout the course of deliberations and until he was discharged"].)  The same thing

happened in *Armstrong*.  The prejudice involving the discharge of the deliberating juror

in that case was similarly obvious because the record disclosed the erroneously excused

juror was leaning in defendant's favor.  Accordingly, defendant's reliance on *Cleveland*

and *Armstrong* is misplaced.[22]

---

[22] Moreover, neither *Cleveland* nor *Armstrong* overruled this court's holding in *Bowers, supra,* 87 Cal.App.4th at page 735, applying the *Watson* standard to the erroneous discharge of seated jurors under section 1089.  And neither case stated reversal is always required when the trial court erroneously discharges a juror under section 1089.  Had our high court intended to hold that such an error is per se prejudicial, we are confident it would have expressly done so.  It is well-established that cases involving per se prejudice involve structural errors.  (*People v. Singh* (2015) 234 Cal.App.4th 1319, 1330 (*Singh*).)  A structural error is a " ' "defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself." ' "  (*People v. Mil* (2012) 53 Cal.4th 400, 410.)  Such errors " 'deprive defendants of "basic protections" without which "a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence." ' "  (*Ibid*.)  As this court has previously noted:  "Under the California Supreme Court's approach, structural error exists only in a very *limited* class of cases (generally involving an impingement on the right to counsel or self-representation, bias on the part of the court or jury, a defective instruction on reasonable doubt, the denial of a public trial, and an erroneous *denial* of a *Wheeler–Batson* motion) in which the error has the effect of rendering the factfinding process unreliable, or causing the trial to be fundamentally unfair. [Citation.]"  (*Singh,* at p. 1330, citing *Mil* at p. 410.)  Here, the erroneous discharge of the juror did not render the factfinding process unreliable; nor did it render defendant's trial fundamentally unfair.

Here, defendant has failed to demonstrate the discharge of Juror No. 2 was prejudicial under the *Watson* standard. Juror No. 2 was discharged before deliberations, and there is no indication he was leaning one way or the other on the question of defendant's guilt from statements he made during the presentation of the evidence as the juror did in *Hamilton*, *supra*, 60 Cal.2d at pages 123, 127-128. Nor is there any other prejudice that can be gleaned from the record. And, as in *Abbott*, "[t]he juror who was substituted for [Juror No. 2] was examined fully by both sides on *voir dire*, accepted as a qualified alternate and served as such from the start of the trial until seated as a regular juror. There is no claim that he was unable to render a fair verdict." (*Abbott*, *supra*, 47 Cal.2d at pp. 371-372; See also, *People v. Tate* (2010) 49 Cal.4th 635, 672 [" ' "[T]he general rule [is] that an erroneous exclusion of a juror for cause provides no basis for overturning a judgment." . . . Defendant has a right to jurors who are qualified and competent, not to any particular juror' "].) As noted, defendant had a right to an impartial jury. That is what he got.

Applying the *Watson* standard as this court did in *Bowers*, *supra*, 87 Cal.App.4th at page 735, we conclude the record here does not establish it is "reasonably probable that a result more favorable to defendant would have been reached but for the error" in discharging Juror No. 2.

## III. Prosecutorial Misconduct

Defendant asserts the prosecutor violated his federal constitutional rights by intentionally obtaining privileged and confidential information from the Director of the Conflict Criminal Defenders (CCD) about defense counsel's attempts to obtain expert witness funding. As we explain, this contention is forfeited and defendant has not established ineffective assistance of counsel.

### A. Additional Background

Trial was originally set for September 27, 2018. On September 18, defense counsel moved to continue the trial. In his declaration in support, he stated he had been

41

unable to focus on defendant's case for the past 60 days due to three other cases he was handling. Defense counsel cited several items that needed to be completed before he could competently represent defendant at trial, stating: "Defense has not completed [its] discovery and investigation because of time availability. However, more importantly, actual resources in the form of money to execute basic investigation / other services are currently not available to the defendant or my office." Defense counsel indicated he would be filing "an ancillary request for funding based on [defendant's] apparent current indigent status" if defendant or his family were unable to provide funding by the end of the following week.

The prosecution filed a written opposition to the continuance motion. In it, the prosecutor addressed the request for ancillary funding, noting "an email from the Director of the [CCD] on Friday, September 14, 2018, stated that [defense counsel] only recently applied for ancillary services; however, he did not comply with their policies and procedures. Due to a previous request for ancillary funding, [defense counsel] is familiar with CCD's policies and procedures."

At the hearing on the motion, the prosecutor explained that she contacted the CCD Director and received an email response indicating a request for ancillary funding had been received, but because "the proper policy and procedures were not followed . . . nothing had even been started as of Friday." In response, defense counsel stated he was "very concerned about [the prosecutor's] interaction with the indigent panel" and added: "I'm putting on the record that is supposed to be ex[ ]parte and confidential. I have no understanding why the conflict panel is sharing that with [the] prosecution. Generally those motions are required to be done by law sealed in camera, and it was not."

The trial court noted that was a separate issue from the motion for continuance, adding: "[Defense counsel], you may make a motion regarding that. If you want to ask the court regarding that I would discuss that with you at that time." After further argument on the continuance motion, the trial court asked defense counsel for a guarantee

42

as to when he would be able to proceed to trial. Defense counsel responded: "I would like to have interaction with the panel before I make that guarantee." The trial court indicated that would be fine and continued the hearing until the following week.

In the meantime, the matter was transferred to a different department by order of the presiding judge. Trial was set to begin in the new department on October 22, 2018. Trial ultimately proceeded as scheduled, though defense counsel made several additional motions for continuances.

After the trial and prior to the sentencing hearing, defense counsel filed another motion for continuance. In response to the prosecutor's argument in opposition to the motion, defense counsel stated: "Let's start with [the prosecutor's] unconstitutional irreverence for my client's due process in that she unilaterally, without any authority approached [the CCD Director] . . . and had ex parte communications, presumably, according to her, which I can't fathom is true." The trial court interrupted defense counsel and explained "this is not the time and place to reiterate arguments that you've previously made in connection with other continuances." Defense counsel stated he understood and indicated he would "put it on paper and file." After further argument, the details of which will be set forth during our discussion of defendant's *Franklin* issue, the trial court granted the requested continuance. Defense counsel did not file a motion seeking redress for the prosecutor's communication with the CCD Director.

### B. Forfeiture

Defendant argues "the prosecutor interfered with [his] right to counsel by intentionally obtaining privileged and confidential information from the [CCD]." This prosecutorial misconduct, defendant argues, is also "governmental behavior that 'shocks the conscience' [and] violates [his] due process rights," requiring reversal of his convictions.

43

Generally, "[t]o preserve a misconduct claim for review on appeal, a defendant must make a timely objection." (*People v. Davis* (2009) 46 Cal.4th 539, 612; *People v. Gamache* (2010) 48 Cal.4th 347, 370-371.)

Defense counsel complained that he was "very concerned about [the prosecutor's] interaction with the indigent panel," noting defense requests for ancillary services are "supposed to be ex[ ]parte and confidential." But this complaint was registered in connection with defendant's motion for a continuance. The trial court noted this was a separate issue and invited defense counsel to "make a motion regarding that." He never did. After the matter was transferred to a different department, effectively giving the defense the continuance initially sought, defense counsel requested a further continuance and complained about the denial of certain ancillary funding. But it was not until after defendant's conviction, at the time set for sentencing, that defense counsel again brought up the prosecutor's communication with the CCD Director, calling it "unconstitutional irreverence for my client's due process," again in connection with a motion for continuance. When the trial court stated it was "not the time and place" for that argument, counsel stated he understood and indicated he would "put it on paper and file." He never did.

Thus, the trial court was never called upon to decide whether or not the prosecutor engaged in misconduct, let alone whether that misconduct amounted to "governmental behavior that 'shocks the conscience' " in violation of defendant's due process rights. The claim is therefore forfeited.[23] (*People v. Low* (2010) 49 Cal.4th 372, 393, fn. 11 [due process challenge to defendant's conviction based on claim of outrageous government conduct forfeited where not raised at trial].)

---

[23] Our resolution of this issue on forfeiture grounds should not be viewed as an indication we condone the prosecutor's conduct.

### C. Alternative Claim of Ineffective Assistance of Counsel

Anticipating forfeiture, defendant argues in the alternative that defense counsel provided constitutionally deficient assistance by failing to adequately preserve this claim for review. We are not persuaded.

We discuss the legal principles related to claims of ineffective assistance of counsel, *post*. Suffice it to say here, we conclude defendant has not shown the prosecutor's inquiry to CCD and the information she obtained prejudiced defendant under the applicable standards, i.e., that there is a reasonable probability that had counsel raised the claim in the trial court defendant would have obtained a more favorable result.

### IV. Asserted Evidentiary Error and Prosecutorial Misconduct

Defendant contends the trial court prejudicially abused its discretion and further violated his constitutional rights by allowing the prosecutor to present misleading testimony and argument regarding the defense's ability to perform its own expert forensic analysis. We disagree.

### A. Additional Background

Defendant moved in limine to prevent the prosecutor from arguing to the jury that he "could have obtained an independent scientific test" or "could have independently analyzed the scientific evidence," arguing: "The need for this request is compounded by the denial of funding and lack of funding provided for this case to the indigent defendant" by the CCD.

At the in limine hearing, defense counsel elaborated: "There are all sorts of things that I believe need to be done in this case but because of [defendant's] indigence and the lack of funding or perceived lack of need for funding per my requests those have not currently been given. I continue to work and advocate and find those funds. And as that evolves I'll let everyone know. [¶] Here is my concern: I have a duty to investigate. . . . [¶] I am diligent in investigating and I have diligently found a need for duplicity of things that I think need to be done in this case, especially a homicide case, attempted

45

homicide case and great bodily injury, assault. With that said, I am in a terrible position. Because if I start to talk about: Well, you didn't test for this, did you? The immediate response potentially could be: Well, the defense had access to that but did not. And therefore, there is a negative inference associated because we're trying to hide something or my client is guilty." Defense counsel argued such an argument would amount to "an unfair, unconstitutional shifting of the burden [of proof] . . . beyond a reasonable doubt as to guilt" from the prosecution to the defense.

The prosecutor responded: "I would object to that. I don't have anything to do with the defense's timeliness or lack of ancillary funding. That is between him and whatever county official he's been in contact with. It has nothing to do with me or my office. There is a plethora of case law as to a failure to call logical witnesses. And if there is some sort of argument regarding that, I will intend to address that. [¶] I will put on the record that counsel perfectly knows that he can ask me to do testing. In fact, in this case he asked me to do DNA testing and I did. So his argument rings hollow to me, and I will bring that up."

The trial court denied the motion.

Towards the end of trial, the prosecution witness who tested the blue sweatshirt for gunpowder residue testified about the samples she collected from the sweatshirt and the testing she performed. During cross-examination, defense counsel focused on the testing she did not perform, including defendant's pants and shoes. On redirect, the prosecutor asked the witness: "Now, if the defense wants analysis for any other types of items not requested by the prosecution, you do those analyses, correct?" The witness answered: "Correct." The prosecutor followed up with: "Now, counsel asked you something about pants. [¶] Were you ever asked to do any sort of analysis on pants?" The witness answered: "No, I was not."

Defense counsel objected to this line of questioning. The trial court sustained the objection and invited counsel to discuss the matter at sidebar. Later, the court explained,

46

the prosecutor would be allowed to ask the witness "about the defense's access to the evidence and that they could do their own testing." But the prosecutor would be precluded from asking questions about whether the defense could, instead of conducting its own testing of the evidence, ask the prosecutor to conduct additional testing. This ruling was made under Evidence Code section 352 because that line of questioning was potentially confusing and misleading for the jury. The trial court also noted at sidebar that "the defense was playing both sides of the coin" because "the defense did ask for the DNA testing," which was provided by the prosecution, but nevertheless excluded such questioning.

When questioning resumed, the prosecutor asked: "[I]n your experience at the crime lab, if the defense wants access to the evidence or any other evidence for testing, they have access to the evidence as well. Fair to say?" The witness answered: "Yes." On recross, defense counsel asked the witness whether there would be a fee for such testing and how much it would be. The witness stated there would be a fee, but she did not know the amount.

During closing argument, the prosecutor argued: "Counsel has gone over and over it's my burden of proof and that's absolutely right. But the truth of the matter is everybody has access to the evidence equally. A lot of folks think it's my evidence. It is not. It is just the evidence. Both sides have access to the evidence. You can't sit back . . . and Monday-night-quarter backing; when you see what happens on Sunday night and you come back and criticize . . . . Well, this isn't a game. It isn't a game. We're not sitting back to pounce on everything that was done wrong. You consider the evidence that's presented."

### B. Analysis

On appeal, defendant argues the trial court abused its discretion under Evidence Code section 352 and "unconstitutionally shifted the burden to the defense, suggesting the defense had an obligation to present evidence." As for the prosecutor's conduct in

response to those rulings, defendant argues the prosecutor unfairly took advantage of the rulings by presenting misleading testimony and argument, specifically, "that the defense had equal access to the evidence and could have facilitated its own testing." We address and reject each argument in turn.

A prosecutor's question asking whether the defense had the opportunity to independently test evidence is not improper. (*People v. Cook* (2006) 39 Cal.4th 566, 607 (*Cook*) [prosecutor's question to ballistics expert whether defense could have subjected the evidence to testing by an independent laboratory did not shift the burden of proof].)

Nor need the question have been precluded under Evidence Code section 352, which provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." "Evidence is not inadmissible under section 352 unless the probative value is 'substantially' outweighed by the probability of a 'substantial danger' of undue prejudice or other statutory counterweights. Our high court has emphasized the word 'substantial' in section 352. [Citations.] [¶] Trial courts enjoy ' "broad discretion" ' in deciding whether the probability of a substantial danger of prejudice substantially outweighs probative value. [Citations.] A trial court's exercise of discretion 'will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' " (*People v. Holford* (2012) 203 Cal.App.4th 155, 167-168 (*Holford*).)

The trial court did not abuse its discretion in finding the probative value of the challenged testimony was not *substantially* outweighed by a *substantial* danger of undue prejudice or any other Evidence Code section 352 concern. The evidence tended to rebut the suggestion, inherent in defense counsel's questions, that potentially exculpatory evidence might have been uncovered had additional testing been performed. To the

extent that it also suggested the defense possessed the means to either perform its own testing or pay the fee associated with having the prosecution witness perform the additional tests, we conclude this suggestion did not substantially prejudice the defense. Nor was any prejudice unfair in light of the fact that it was defense counsel who opened the door for this line of questioning by suggesting additional items of clothing should also have been tested for gunpowder residue.

Nor did this evidentiary ruling improperly shift the burden of proof to the defense. (*Cook*, *supra*, 39 Cal.4th at p. 607.) Nothing in the witness's answer suggested defendant had the burden of proving anything. The jury was fully and correctly informed about the burden of proof. And the prosecutor acknowledged during her closing argument that the burden of proof was hers to carry.

Finally, we reject defendant's argument that the prosecutor unfairly took advantage of the trial court's rulings to elicit the above-described evidence and argue to the jury that the defense had equal access to the evidence. In making this argument, he relies on *People v. Varona* (1983) 143 Cal.App.3d 566 and *People v. Daggett* (1990) 225 Cal.App.3d 751, each of which "involved *erroneous evidentiary rulings* on which the prosecutor improperly capitalized during his closing argument." (*People v. Lawley* (2002) 27 Cal.4th 102, 156, italics added.) The trial court's ruling was not erroneous here. Moreover, the prosecutor merely pointed out the physical evidence was not hers and that both sides have access to it. There was nothing inappropriate about this argument.

We conclude the trial court did not abuse its discretion or violate defendant's constitutional rights by allowing the prosecutor to elicit the testimony set forth above; nor did the prosecutor engage in misconduct by eliciting the evidence or arguing the defense had equal access to the evidence.

## V. Circumstantial Evidence Instructional Error Claim

Defendant contends the trial court prejudicially erred by improperly instructing the jury regarding their evaluation of circumstantial evidence. Again, we disagree.

The jury was instructed with CALCRIM No. 225 regarding their evaluation of circumstantial evidence proving defendant acted with a particular intent or mental state. The instruction provided: "The People must prove not only that the defendant did the acts charged, but also that he acted with a particular intent and/or mental state. The instruction for each crime and allegation explains the intent and/or mental state required. [¶] An intent and/or mental state may be proved by circumstantial evidence. [¶] Before you may rely on circumstantial evidence to conclude that a fact necessary to find the defendant guilty has been proved, you must be convinced that the People have proved each fact essential to that conclusion beyond a reasonable doubt. [¶] Also, before you may rely on circumstantial evidence to conclude that the defendant had the required intent and/or mental state, you must be convinced that the only reasonable conclusion supported by the circumstantial evidence is that the defendant had the required intent and/or mental state. If you can draw two or more reasonable conclusions from the circumstantial evidence, and one of those reasonable conclusions supports a finding that the defendant did have the required intent and/or mental state and another reasonable conclusion supports a finding that the defendant did not, you must conclude that the required intent and/or mental state was not proved by the circumstantial evidence. However, when considering circumstantial evidence, you must accept only reasonable conclusions and reject any that are unreasonable."

As the bench notes for CALCRIM No. 225 explain, this instruction is appropriate "when the defendant's intent or mental state is the only element of the offense that rests substantially or entirely on circumstantial evidence." (Judicial Council of Cal. Crim. Jury Instns. (2017) Bench Notes to CALCRIM No. 225, p. 909.) But where "other elements

50

of the offense also rest substantially or entirely on circumstantial evidence," the trial court should instead instruct the jury with CALCRIM No. 224. (*Ibid.*)

CALCRIM No. 224 provides: "Before you may rely on circumstantial evidence to conclude that a fact necessary to find the defendant guilty has been proved, you must be convinced that the People have proved each fact essential to that conclusion beyond a reasonable doubt. [¶] Also, before you may rely on circumstantial evidence to find the defendant guilty, you must be convinced that the only reasonable conclusion supported by the circumstantial evidence is that the defendant is guilty. If you can draw two or more reasonable conclusions from the circumstantial evidence, and one of those reasonable conclusions points to innocence and another to guilt, you must accept the one that points to innocence. However, when considering circumstantial evidence, you must accept only reasonable conclusions and reject any that are unreasonable."

At the jury instruction conference, defense counsel asked the trial court to instruct the jury with CALCRIM No. 224, arguing defendant's identity as the shooter rested substantially on circumstantial evidence. The trial court disagreed and, relying on *People v. Malbrough* (1961) 55 Cal.2d 249 (*Malbrough*), instructed the jury with CALCRIM No. 225.

Although circumstantial evidence was admitted to prove his identity as the shooter, such as gunpowder residue found on the sweatshirt recovered from S.S.'s house and defendant's DNA found on that sweatshirt, CALCRIM No. 224 "should not be given where circumstantial evidence is incidental to and corroborative of direct evidence." (*People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1171; *Malbrough*, *supra*, 55 Cal.2d at pp. 250-251.) Here, defendant's identity as the shooter was primarily established by direct evidence, specifically the eyewitness identifications to the police. As our Supreme Court has stated in *People v. Anderson* (2001) 25 Cal.4th 543, "by introducing circumstantial evidence merely to corroborate an eyewitness, the prosecution did not

51

substantially rely on such evidence." (*Id*. at p. 582.) Accordingly, the trial court's decision to instruct with CALCRIM No. 225 rather than CALCRIM No. 224 was proper.

## VI. Cumulative Prejudice

Defendant further asserts the cumulative prejudicial impact of the asserted errors requires reversal. However, there being no error to accumulate with the error related to discharging Juror No. 2, defendant's assertion of cumulative prejudice also fails.

## VII. Sentencing Claims

Defendant brings two sentencing matters to this court's attention. The first implicates our high court's recent decision in *People v. Tirado* (2022) ___ Cal.5th ___ ; 2022 WL 176141.

### A. Reduction of Defendant's Firearm Enhancements

Defendant argues the matter must be remanded so the trial court can exercise its discretion as to whether to reduce the section 12022.53, subdivision (d) firearm enhancements to lesser firearm enhancements under subdivisions (a), (b), or (c), or under section 12022.5, subdivision (a) — notwithstanding that none of those lesser enhancements had been charged.

There had been a split of authority on this issue. (See *People v. Tirado* (2019) 38 Cal.App.5th 637, review granted Nov. 13, 2019, S257658 and *People v. Morrison* (2019) 34 Cal.App.5th 217. We originally agreed with the Fifth District's decision in *Tirado,* which held the trial court was not permitted to impose a lesser uncharged statutory enhancement. (*Tirado,* at p. 644.) But our high court, granting review in *Tirado*, reached the opposite conclusion.

Our high court held: "When an accusatory pleading alleges and the jury finds true the facts supporting a section 12022.53(d) enhancement, and the court determines that the section 12022.53(d) enhancement should be struck or dismissed under section 12022.53(h), the court may, under section 12022.53(j), impose an enhancement under

52

section 12022.53(b) or (c)" — even where those lesser enhancements were not charged. (*Tirado*, *supra*, 12 Cal.5th at p. 700.)

We shall, accordingly, remand this matter back to the trial court to allow it to determine whether it should exercise its discretion under section 12022.53, subdivision (h) and section 1385 to strike the section 12022.53, subdivision (d) enhancement and impose instead a lesser enhancement under subdivisions (b) or (c) of section 12022.53.

### B. Dueñas *Claim*

Second, defendant asserts that we must stay the $10,000 restitution fine because it was imposed without a determination of his ability to pay in violation of his constitutional rights. In making this claim, defendant relies on *Dueñas, supra,* 30 Cal.App.5th 1157, for the premise that such a determination is constitutionally required. But for reasons explained more fully elsewhere, we are in agreement with the line of cases concluding *Dueñas* was wrongly decided and reject defendant's claim on that basis.[24] (See *People v. Hicks* (2019) 40 Cal.App.5th 320, review granted Nov. 26, 2019, S258946; *People v. Kingston* (2019) 41 Cal.App.5th 272, 279-281; *People v. Aviles* (2019) 39 Cal.App.5th 1055, 1068-1069; *People v. Caceres* (2019) 39 Cal.App.5th 917, 927.) Stated simply, the strands of precedent relied upon by the *Dueñas* court in expanding due process protections to require an ability to pay determination before imposing a mandatory fine, fee, or assessment do not support, and indeed run contrary to, such an expansion. Imposition of the challenged financial obligations has not deprived

---

[24] Our Supreme Court is poised to resolve this question, having granted review in *People v. Kopp* (2019) 38 Cal.App.5th 47, review granted November 13, 2019, S257844, which agreed with the court's conclusion in *Dueñas* that due process requires the trial court to conduct an ability to pay hearing and ascertain a defendant's ability to pay before it imposes court facilities and court operations assessments under section 1465.8 and Government Code section 70373, but not restitution fines under section 1202.4. (*Kopp,* at pp. 95-96.)

defendant of access to the courts. Nor has defendant been incarcerated because of his inability to pay. Rather, he was incarcerated because of his crimes.

Nor has defendant persuaded us that imposition of the fines and fees in this case violated his Eighth Amendment right against excessive fines, as that right was recently described by the United States Supreme Court in *Timbs v. Indiana* (2019) ___ U.S. ___ [203 L.Ed.2d 11]. That case is so manifestly inapposite we decline to discuss it at all. Instead, we simply note defendant has cited us to no authority, nor have we discovered any on our own, supporting the position that the restitution fine imposed in this case is excessive in relation to either the gravity of defendant's offenses or his economic situation. (*Id.* at p. ___ [203 L.Ed.2d at p. 17].)

## VIII. Ineffective Assistance of Counsel Claim Related to *Franklin* Materials

Defendant argues his trial counsel provided constitutionally deficient assistance by failing to submit a packet of mitigation materials under *Franklin*, *supra*, 63 Cal.4th 261. We conclude defendant has not carried his burden to establish ineffective assistance of counsel in this direct appeal and that the matter is more appropriately addressed in a habeas corpus proceeding.

### A. Additional Background

The jury returned their verdict in November 2018. Defense counsel asked for sentencing to be set about 60 days out, "because of the nature and potential litigation packages, the *Franklin* packet and all those sorts of things." The trial court agreed, setting the hearing for January 11, 2019.

On that date, defense counsel stated he had not been provided a copy of a probation report and the court indicated that a memo containing victim impact statements had just been provided from the probation department that morning. Defense counsel requested a continuance so defendant's grandfather, who was out of state, could attend sentencing and be heard on defendant's behalf. Counsel also wanted to obtain the probation report and go over it with defendant. Counsel suggested the sentencing hearing

54

could start that day with the victim's family addressing the court and asked "that the defense's ability to put on any kind of information and/or references or commentary from the family be put over to a secondary date."

The prosecutor objected, arguing the defense had "no right to make commentaries or speak at a judgment and sentencing," and while defendant had the right under *Franklin* to present materials for purposes of an eventual youth offender parole hearing, defense counsel had previously asked for the current date for that purpose. The prosecutor argued *Franklin* materials had no bearing on the judgment and sentencing, and further argued the two-day notice she had been provided regarding the request for a continuance was unfair to the victim's family. As for the appearance of the grandfather, the prosecutor asserted, "There is no right for a continuance for family members to be present at the judgment and sentencing." The prosecutor asked the court to proceed with sentencing. She had stated in her written opposition, however, that the prosecution did not oppose "the defense filing its *Franklin* materials with the court within a specified period of time as long as copies were provided to the People."

Defense counsel responded by requesting more time to create the *Franklin* package, again suggesting the sentencing hearing could begin, and asserted there was no reason to cut defendant's ability to participate in his sentencing and speak. The trial court put the matter over to the afternoon so defense counsel could review the probation report and then go over it with defendant. When the parties returned, the trial court indicated it had further considered defendant's motion and granted a continuance of judgment and sentencing to February 8, 2019.

Prior to adjourning, defense counsel explained to the court he had had difficulty up to that point regarding the *Franklin* packet. After expressly noting defendant's family was present in the courtroom at that time, he explained that getting information from them had been difficult. He explained he had requested materials from defendant's mother that could be provided to a psychiatrist to "create a baseline." He also had

conversations with defendant's mother about funding for a psychiatrist and was trying to work with her and the grandfather to come up with the necessary funds. He noted that funds from the county had not been forthcoming. Counsel told the court that if he could not get funds, another continuance might be requested. He complained if he could not get funding from the county or the family, he would be "stuck, hamstrung, and with both my hands literally and figuratively tied behind my back to provide what I need to do for [defendant]." He then said: "I'm looking directly at the mother now — hopefully, to work with her to get the letter and photographs, other baseline materials or baseline evaluations of [defendant's] intellectual and emotional and psychological maturity baseline to help the Court understand that baseline per *Franklin* and to create an encapsulized [sic] factual finding and bases for later parole hearings."

On February 8, 2019, defense counsel still had not submitted a *Franklin* packet. He again moved for a continuance. The central thrust of the request was the lack of resources to retain an expert and prepare a psychological evaluation; a request for funding had been made and denied. He informed the court "[t]he family does not have the funds" and added, "[t]hey're not responsible for [defendant's] funding. [Defendant] is indigent." Counsel had obtained juvenile records and planned to provide those to whomever would do the social history or psychiatric evaluation. The prosecution argued that although section 3051 makes reference to psychological evaluations, the defense has no right to one.

The trial court tentatively denied the continuance, pending an in camera hearing related to a statement defendant wanted to make to the court confidentially. In tentatively denying the continuance, the court stated: "the defense has in fact had every reasonable opportunity and incentive to make an adequate record for [defendant's] eventual Youth Offender Parole hearing." The court noted the defense had been given three months to prepare and collect information relevant to an eventual youth offender parole hearing.

When the trial court resumed the public proceedings, it denied the request for a continuance and proceeded with sentencing. When the court asked defense counsel if defendant was waiving arraignment for judgment and sentence, defendant told the court, "I want to get the sentencing over with. Sentence me today."

Defense counsel informed the court he had received "indicia" from defendant's mother that would be made part of the "societal history" in a *Franklin* submission. Counsel asked the court to allow defendant's mother, aunt, and one or two of his brothers to speak on defendant's behalf, counsel's express intent being to "lay the foundation for [a] societal history," which he indicated would be subsequently submitted. The prosecutor objected, arguing: "They can absolutely submit statements in writing as part of the Franklin packet, but there is no right to give a verbal statement as to the defendant. This is the time for victim impact statements. It is the time for the victims to finally be heard."[25] The prosecutor also complained that the statement from defendant's mother defense counsel referenced had not been turned over to the prosecution.

The court responded: "The law does not currently authorize such statements in support, or whether they're mitigation or Franklin to be made in the way that you have suggested." The court then asked whether there was additional comment, and at that point, defendant stated: "I don't even want no Franklin. Just get this sentence over with. I don't need no Franklin. I don't need any of that. If the family gonna speak, let the family speak. Get it over with." Defense counsel then stated: "I will file a subsequent packet, Your Honor, on that. But I will and am absolutely reserving to do that, despite [defendant's] statement on the record." The trial court then sentenced defendant. No *Franklin* packet was ever filed by defense counsel.

---

[25]  As discussed *post*, a trial court is, in fact, authorized to hear testimony from a defendant's family members at a *Franklin* hearing.

**B. Analysis**

On appeal, defendant argues his trial counsel "repeatedly acknowledged the *Franklin* procedure, and repeatedly expressed his intention to file *Franklin* materials," and his "failure to follow through on his intention to file *Franklin* materials constitutes deficient performance." For the reasons we shall discuss, we cannot find ineffective assistance of counsel on this record, but note such a record could be developed in a habeas corpus proceeding.

**1. Legal Principles Related to Ineffective Assistance of Counsel Claims**

To prevail on a claim of ineffective assistance of counsel, a defendant must show (1) counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and (2) the deficient performance prejudiced defendant. (*Strickland v. Washington* (1984) 466 U.S. 668, 688, 691-692 [80 L.Ed.2d 674, 693-694, 696] (*Strickland*); *People v. Ledesma* (1987) 43 Cal.3d 171, 216-218 (*Ledesma*).) " 'Surmounting *Strickland*'s high bar is never an easy task.' " (*Harrington v. Richter* (2011) 562 U.S. 86, 105 [178 L.Ed.2d 624, 642] (*Richter*), quoting *Padilla v. Kentucky* (2010) 559 U.S. 356, 357 [176 L.Ed.2d 284, 297].)

To establish prejudice, "[i]t is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.' " (*Richter*, *supra*, 562 U.S. at p. 104.) A defendant must show a reasonable probability that he would have received a more favorable result had counsel's performance not been deficient. (*Strickland*, *supra*, 466 U.S. at pp. 693-694; *Ledesma*, *supra*, 43 Cal.3d at pp. 217-218.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland*, at p. 694; accord, *Ledesma*, at p. 218.) The likelihood of a different result must be substantial, not just conceivable. (*Richter*, at p. 112.) Stated slightly differently, a defendant must prove prejudice that is a ' "demonstrable reality," *not simply speculation*.' [Citation.]" (*People v. Fairbank* (1997) 16 Cal.4th 1223, 1241, italics added.)

"It is particularly difficult to prevail on an appellate claim of ineffective assistance. On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation. All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding." (*People v. Mai* (2013) 57 Cal.4th 986, 1009, italics omitted.)

### 2. Preserving Information for Future Youthful Offender Parole Hearings

To bring juvenile sentencing in California into conformity with United States Supreme Court Eighth Amendment cases pertaining to juveniles, the Legislature enacted Senate Bill No. 260 (2013-2014 Reg. Sess.), effective January 1, 2014, adding sections 3051 and 4801, subdivision (c), to the Penal Code. "These provisions require the Board of Parole Hearings (Board), with certain limited exceptions, to conduct a youth offender parole hearing no later than a juvenile offender's 25th year of incarceration (and at earlier points depending on the offender's 'controlling offense') (§ 3051, subd. (b)) and, when considering parole eligibility for these youth offenders, to 'give great weight to the diminished culpability of juveniles as compared to adults, the hallmark features of youth, and any subsequent growth and increased maturity' (§ 4801, subd. (c))." (*People v. Sepulveda* (2020) 47 Cal.App.5th 291, 298 (*Sepulveda*).)

"In directing the Board to 'give great weight to the diminished culpability of juveniles as compared to adults, the hallmark features of youth, and any subsequent growth and increased maturity of the prisoner' ([Pen. Code,] § 4801, subd. (c)), the statutes also contemplate that information regarding the juvenile offender's characteristics and circumstances at the time of the offense will be available at a youth offender parole hearing to facilitate the Board's consideration." However, assembling information about the individual before the crime, the *Franklin* court explained, "is typically a task more easily done at or near the time of the juvenile's offense rather than

59

decades later when memories have faded, records may have been lost or destroyed, or family or community members may have relocated or passed away. . . . Consideration of 'subsequent growth and increased maturity' implies the availability of information about the offender when he was a juvenile." (*Franklin*, *supra*, 63 Cal.4th at pp. 283-284.) Accordingly, our high court in *Franklin* authorized a post-sentencing trial court proceeding in which "the [trial] court may receive submissions and, if appropriate, *testimony* pursuant to procedures set forth in section 1204 and rule 4.437 of the California Rules of Court, and subject to the rules of evidence. [The defendant] may place on the record any documents, evaluations, *or testimony* (*subject to cross-examination*) that may be relevant at his eventual youth offender parole hearing, and the prosecution likewise may put on the record any evidence that demonstrates the juvenile offender's culpability or cognitive maturity, or otherwise bears on the influence of youth-related factors." (*Franklin*, at p. 284, italics added.)[26]

Here, we cannot conclude that trial counsel was incompetent in not submitting a *Franklin* package without further development of the factual record, including, testimony from counsel as to why. Reviewing courts are not permitted to find ineffective assistance on the basis of speculation there was evidence that would have been helpful to the defense that counsel did not provide – here, evidence that demonstrated a diminished level of culpability related to youth, cognitive immaturity, or any information concerning youth-related factors.

---

[26] Contrary to implications of the prosecutor's argument, a trial court is authorized to hear from a defendant's family members at *Franklin* hearing in the form of testimony. Accordingly, the family could have provided testimony here. Of course, they would have then been under oath and subject to cross-examination. (*Franklin*, *supra*, 63 Cal.4th at p. 284; See also *In re Cook* (2019) 7 Cal.5th 439, 446-447 [allowing defendants whose convictions became final prior to *Franklin* to make a *Franklin* record under section 1202.01].) Defendant does not challenge the trial court's ruling on this issue in this appeal.

Our dissenting colleague calls the fact that trial counsel did not submit a *Franklin* package "inexplicable." (Dis. opn. *post*, at p. 4.) The dissent goes on to state: "there is no indication that counsel believed there was no relevant information to provide," and the fact that counsel asked the trial court to allow family members to speak, "suggests they had something relevant to say in this regard." (*Id.* at p. 7.) Further, the dissent notes counsel said he would provide a *Franklin* package even after defendant declared, "I don't need no Franklin . . . ." (*Ibid.*) Yet, he did not do so.

But in our view, our dissenting colleague's belief that there must have been something helpful defense counsel could have submitted is grounded on speculation, and point in fact, the record suggests potential explanations why a *Franklin* package was not submitted. There were funding issues that impeded production of a social-psychological evaluation. Additionally, there was an apparent lack of cooperation by the family. Indeed, regarding counsel's request to have the family address the court at sentencing, it may be, with them all present at one time in the same place, counsel saw this as a last opportunity to put something on the record that *might* be helpful, without really knowing it would be helpful. And while our dissenting colleague places weight on the absence of anything in the record indicating "that counsel believed there was no relevant information to provide" (Dis. opn. *post*, at p. 7), we would not expect counsel to articulate such a belief while in the process of determining whether there might be something to offer.

As for not providing a submission after the sentencing, for all we know, defendant may have told his family not to provide any statements or otherwise cooperate and they complied with his request. This is certainly plausible given his insistence he did not want a *Franklin* package submitted. Or perhaps the "indicia" defendant's mother provided before the sentencing hearing (whatever that was) and statements that may have been collected post-sentencing (if there were any) did not show immaturity or other youth-related factors. It is also possible that if counsel obtained statements post-sentencing, those statements hurt defendant, and defense counsel made a tactical decision not to

61

submit them. And it could be that counsel thought the prosecution might object to the written statements from the family without the ability to cross-examine them in an effort to develop information that might be helpful to the prosecution at a youthful offender parole hearing. As our dissenting colleague acknowledges, "we do not know what defendant's family members would have said regarding his youth and immaturity at the time of the offense." (Dis. opn. *post*, at p. 7.) While the information might have been helpful, it might also have hurt defendant's interests.

Of course, this too is speculation — but the point is we simply do not know whether there was information defense counsel could have submitted that would have been helpful at a future parole hearing or whether there were tactical reasons for not submitting whatever information counsel had obtained. Our dissenting colleague and appellate counsel might ultimately be proven correct in their perception that trial counsel simply dropped the ball here. But we cannot speculate that is what happened. " '[I]f the record ' "sheds no light on why counsel acted or failed to act in the manner challenged," ' we must reject the [ineffective assistance of counsel] claim ' "unless counsel was asked for an explanation and failed to provide one, *or unless there simply could be no satisfactory explanation.*" ' " (*Sepulveda, supra*, 47 Cal.App.5th at p. 301, italics added.) Here, there *could be* satisfactory explanations.

Accordingly, we reject defendant's claim of ineffective assistance of counsel on this direct appeal. His claims should be raised in a petition for habeas corpus. (See *Sepulveda, supra*, 47 Cal.App.5th at pp. 299-302 [rejecting defendant's claim of ineffective assistance of counsel related to counsel's decision to stipulate to submission of written *Franklin* materials; noting counsel could have determined defendant would benefit more by a stipulated agreement to have the *Franklin* memorandum presented without contemporaneous challenge or contradiction from the prosecution; and concluding defendant's claim of ineffective assistance should be presented in a petition for writ of habeas corpus so counsel could explain his decision to stipulate].)

## DISPOSITION

We affirm the conviction but remand to allow the trial court to consider exercising its discretion under section 12022.53, subdivision (h) and section 1385 to strike the section 12022.53, subdivision (d) enhancement in the interest of justice and impose instead a lesser enhancement under subdivisions (b) or (c) of section 12022.53.

/s/
MURRAY, J.*

I concur:

/s/
HULL, Acting P. J.

---

\*  Retired Associate Justice of the Court of Appeal, Third Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

HOCH, J., Dissenting.

The majority concludes defendant has not established that his trial counsel's failure to submit a packet of mitigation materials under *People v. Franklin* (2016) 63 Cal.4th 261 (*Franklin*), amounted to ineffective assistance of counsel. I disagree and therefore dissent from that portion of the opinion. In all other respects, I concur with my colleagues in the majority and join in the remainder of the opinion.

**A.**

***Background***

The majority provides a thorough recitation of the background facts. I highlight the following:

The jury returned their verdict in this case on November 16, 2018. Defense counsel asked for sentencing to be set about 60 days out so that he would have sufficient time to put together a "*Franklin* packet." The trial court agreed and set the sentencing hearing for January 11, 2019.

On that date, defense counsel requested a continuance, arguing among other things that defendant's grandfather wanted to attend the sentencing and be heard on defendant's behalf, but he was out of state. Defense counsel suggested starting the sentencing hearing so that the victim's family could be heard, but then continuing the hearing to a later date to hear from defendant's family. The prosecutor objected, arguing the defense had "no right to make commentaries or speak at a judgment and sentencing," and while defendant had the right under *Franklin* to present mitigation materials for purposes of an eventual youth offender parole hearing, defense counsel "specifically asked for a time beyond the statutory period to do the work necessary for the *Franklin* materials," but for whatever reason failed to do so. The trial court granted the continuance over the prosecutor's objection and set a new date for sentencing, February 8, 2019.

On that date, defense counsel still had not put together a *Franklin* packet. He again moved for a continuance. The trial court denied the motion, explaining "the

1

defense has in fact had every reasonable opportunity and incentive to make an adequate record for [defendant's] eventual Youth Offender Parole hearing." Defense counsel then asked for the court to allow defendant's mother, aunt, and one or two of his brothers to speak on defendant's behalf. The prosecutor objected.

Before ruling on defense counsel's request to allow defendant's family to present oral statements on his behalf, the trial court indicated its tentative conclusion was that the law authorized it to consider the probation report, comments from defendant, if he chose to make a statement under oath, and victim impact statements, but not statements from defendant's family offered orally at the hearing.[1] When the trial court asked for additional comment, defendant stated: "I don't even want no Franklin. Just get this sentence over with. I don't need no Franklin. I don't need any of that. If the family gonna speak, let the family speak. Get it over with." Defense counsel then stated: "I will file a subsequent packet, Your Honor, on that. But I will and am absolutely reserving to do that, despite [defendant's] statement on the record." The trial court then sentenced defendant. No *Franklin* packet was ever filed by defense counsel.

**B.**

*Ineffective Assistance of Counsel*

A criminal defendant has the right to the assistance of counsel under both the Sixth Amendment to the United States Constitution and article I, section 15, of the California Constitution. (*People v. Ledesma* (1987) 43 Cal.3d 171, 215.) This right "entitles the defendant not to some bare assistance but rather to *effective* assistance. [Citations.] Specifically, it entitles him to 'the reasonably competent assistance of an attorney acting as his diligent conscientious advocate.' [Citations.]" (*Ibid.*) The burden of proving a claim of ineffective assistance of counsel is squarely upon the defendant. (*People v.*

---

[1] I agree with the majority's conclusion that the trial court was indeed authorized to hear from defendant's family at a *Franklin* hearing.

*Camden* (1976) 16 Cal.3d 808, 816.) " 'In order to demonstrate ineffective assistance of counsel, a defendant must first show counsel's performance was "deficient" because his "representation fell below an objective standard of reasonableness . . . under prevailing professional norms." [Citations.] Second, he must also show prejudice flowing from counsel's performance or lack thereof. [Citation.] Prejudice is shown when there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." ' " (*In re Harris* (1993) 5 Cal.4th 813, 832-833, disapproved on another point in *Shalabi v. City of Fontana* (2012) 11 Cal.5th 842, 855; *Strickland v. Washington* (1984) 466 U.S. 668, 687 [80 L.Ed.2d 674, 693].)

In *Franklin*, *supra*, 63 Cal.4th 261, our Supreme Court held that an offender like defendant, who will be entitled to a youth offender parole hearing in the future, must be given "sufficient opportunity to make a record of information relevant to his eventual youth offender parole hearing." (*Id*. at p. 284.) Because Penal Code section 4801, subdivision (c) directs the Board of Parole Hearings (the Board) to "give great weight to the diminished culpability of youth as compared to adults, the hallmark features of youth, and any subsequent growth and increased maturity of the prisoner," the court explained that the statutory scheme also "contemplate[s] that information regarding the [youth] offender's characteristics and circumstances at the time of the offense will be available at a youth offender parole hearing to facilitate the Board's consideration." (*Franklin*, at p. 283.) Assembling such information "is typically a task more easily done at or near the time of the [defendant's] offense rather than decades later when memories have faded, records may have been lost or destroyed, or family or community members may have relocated or passed away." (*Id*. at pp. 283-284.) Thus, the trial court must provide a youth offender with a sufficient opportunity to do so.

3

Defendant argues his trial counsel "repeatedly acknowledged the *Franklin* procedure, and repeatedly expressed his intention to file *Franklin* materials," and his inexplicable "failure to follow through on his intention to file *Franklin* materials constitutes deficient performance." The majority responds by speculating as to possible reasons defense counsel may have reasonably decided not to file *Franklin* materials. Perhaps there simply was no "evidence that would have . . . demonstrated a diminished level of culpability related to youth, cognitive immaturity, or any information concerning youth-related factors" for counsel to have provided on defendant's behalf. (Maj. opn. *ante,* at p. 61.) The majority concludes that because " 'the record on appeal sheds no light on why counsel . . . failed to act in the manner challenged,' " and because there is a potentially " 'satisfactory explanation' " for counsel's failure to file a *Franklin* packet in this case, defendant's "claim of ineffective assistance is more appropriately made in a habeas corpus proceeding," where defense counsel will be able to explain his reasons for not filing the packet. (*People v. Wilson* (1992) 3 Cal.4th 926, 936.)

I am unpersuaded by the majority's reasoning on this issue. The potentially satisfactory explanation relied on by the majority is essentially a perfect storm of imagined impediments. These include a lack of funding, unhelpful family members, obstruction by defendant himself, a lack of any relevant and helpful information relating to defendant's youth, as well as fear on the part of defense counsel over a potential evidentiary objection that might have been made by the prosecution had counsel followed through with submitting the *Franklin* materials he promised to submit.

I acknowledge support in the record for the first two, i.e., apparent funding issues and initial difficulty getting information from defendant's family, specifically his mother, for purposes of preparing a baseline psychological assessment. But defense counsel expressed these problems at the conclusion of the January 11 proceeding. The trial court granted a continuance to February 8 to allow counsel more time to prepare the *Franklin* packet. Then, on that date, still having filed no *Franklin* materials, counsel asked for

4

another continuance, again noting the lack of funds for a psychological evaluation. But counsel also indicated he had obtained juvenile records he planned to provide to the person who would be performing such an evaluation and that defendant's mother had given him "indicia" that he expected would be submitted as part of an eventual *Franklin* packet. As set forth in greater detail above, further continuance was denied, defense counsel sought to present testimony from defendant's family on the *Franklin* issue, which was also denied, and then counsel promised to file a subsequent *Franklin* packet. He never did so.

While the funding issues raised by the majority might well explain why defense counsel could not submit a psychological evaluation as part of a *Franklin* packet, they do not explain counsel's failure to submit *anything at all*. And while counsel's apparent initial difficulty obtaining information from defendant's family might explain his inability to prepare *Franklin* materials by January 11, this does not explain why he was unable to put something together by February 8, especially considering the fact that counsel indicated he had at least some information from defendant's mother that he intended to include as part of a *Franklin* packet. He also indicated that he was in possession of juvenile records that he believed would be helpful to defendant in the preparation of a psychological evaluation. Thus, the record suggests defense counsel had *at least some* information that was relevant and helpful to defendant on the *Franklin* issue. This conclusion is bolstered by the fact that after the trial court denied the requested continuance, counsel sought to have defendant's family members testify at a *Franklin* hearing. Stated simply, if funding issues prevented defense counsel from obtaining the psychological evaluation he wanted, counsel should still have filed whatever information he did have. Indeed, he acknowledged as much when he promised to file a *Franklin* packet after sentencing.

In an attempt to transform defense counsel's failure to file the promised *Franklin* packet into a rational tactical decision, the majority speculates that "defendant may have

5

told his family not to provide any statements or otherwise cooperate and they complied with his request," or "perhaps the 'indicia' defendant's mother provided before the sentencing hearing (whatever that was) and statements that may have been collected post-sentencing (if there were any) did not show immaturity or other youth-related factors," or "possib[ly] . . . if counsel obtained statements post-sentencing, those statements hurt defendant, and defense counsel made a tactical decision not to submit them," or "it could be that counsel thought the prosecution might object to the written statements from the family without the ability to cross-examine them in an effort to develop information that might be helpful to the prosecution at a youthful offender parole hearing." (Maj. opn. *ante,* at p. 62.) I find this to be implausible for several reasons.

First, in support of the plausibility of defendant's imagined directive to his family not to cooperate with defense counsel, the majority reads defendant's "I don't even want no Franklin" statement to indicate that he did not want a *Franklin* packet filed on his behalf. The majority and I simply disagree as to the meaning of defendant's statement. Viewed in context, I do not read defendant's statement to indicate either that he believed his family did not have relevant and helpful information relating to his youth that might assist the Board in its consideration of his release during a future youth offender parole hearing, or that he did not want them to share such information with defense counsel. Instead, defendant was obviously frustrated and wanted his sentencing to be "over with." As stated previously, defense counsel successfully delayed sentencing for almost three months in order to put together a *Franklin* packet and then unsuccessfully sought a further continuance because he still had not done so. It was after that continuance request was denied, and after the trial court indicated that it was tentatively denying counsel's additional request to allow defendant's family to provide *Franklin*-related testimony, that defendant stated "I don't even want no Franklin. Just get this sentence over with." While I agree this statement indicated that defendant did not want the *Franklin* issue to further

6

delay his sentencing, it in no way indicated he did not want any *Franklin* materials filed *at all*, let alone that he believed his family had no helpful information to provide.

Second, while there is no support in the record for the majority's speculation that the information defense counsel received from defendant's mother was actually not relevant to the *Franklin* analysis, or that other information turned out to be harmful, the record does support what I believe to be the more plausible explanation for defense counsel's failure: he simply neglected to do what he repeatedly said he would do. As set forth in greater detail above, defense counsel successfully requested to put off sentencing for 60 days so that he could put together a *Franklin* packet. He did not do so. Whether he tried to do so during that time is unclear, but there is no indication that counsel believed there was no relevant information to provide. Indeed, he asked for and received another continuance to put together the materials. He again did not do so. And again, he asked for a further continuance. This continuance was denied. However, far from indicating that he had no information to present, defense counsel asked the trial court to allow defendant's mother, aunt, and siblings to provide this information orally. The prosecution objected, and the trial court denied this request, so we do not know what defendant's family members would have said regarding his youth and immaturity at the time of the offense. But the fact that defense counsel wanted them to testify suggests they had something relevant to say in this regard. Moreover, even after defendant stated "I don't need no Franklin," defense counsel again indicated he was "absolutely" going to "file a subsequent packet." Once again, counsel did not do so. After all of this, I find it baffling that the majority is willing to speculate that defense counsel might have had a reasonable explanation for filing *nothing at all*.

I would hold defense counsel's failure to file any *Franklin* materials in this case, after receiving two continuances for the purpose of doing so, and after explicitly stating on the record that he would file a *Franklin* packet after the sentencing hearing, amounted to deficient performance. The only reasonable explanation for filing *nothing* would be

7

that defense counsel, after conducting a thorough investigation into the matter, was truly unable to uncover *any* information suggesting defendant's youth and immaturity played a role in his commission of these offenses. I acknowledge it is theoretically possible that youthful immaturity had nothing to do with defendant's decision to bring a loaded handgun to a house party and then use it to shoot the victim to death over a rap song. But unlike my colleagues in the majority, I find that theoretical possibility to be too implausible to require defendant to resort to habeas procedures to secure the relief he seeks.

With respect to prejudice, it should be obvious that a defendant who is entitled to have information regarding his youth and circumstances at the time of the offense considered by the Board at a future youth offender parole hearing is prejudiced by the complete failure to file such information. As the *Franklin* court stated, this "is typically a task more easily done at or near the time of the [defendant's] offense rather than decades later when memories have faded, records may have been lost or destroyed, or family or community members may have relocated or passed away." (*Franklin*, *supra*, 63 Cal.4th 261 at pp. 283-284.) The Attorney General also concedes that if deficient performance is established, "the prejudice prong would be satisfied" and "remand would be warranted to allow [defendant] an opportunity to present *Franklin* materials."

For the foregoing reasons, I would remand the matter for the limited purpose of affording defendant an opportunity "to make a record of information relevant to his eventual youth offender parole hearing." (*Franklin*, *supra*, 63 Cal.4th 261 at p. 284.) Defendant additionally requests that we issue an order directing the trial court to appoint

counsel to assist defendant in filing *Franklin* materials.  I would grant that request as well.



     /s/                

HOCH, J.
